## STATE OF CONNECTICUT *v.* DENNIS NASH
### (SC 17570)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued March 10—officially released June 20, 2006

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Toni M. Smith-Rosario*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *John P. Doyle, Jr.*, and *Ann P. Lawlor*, assistant state's attorneys, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Dennis Nash, appeals from the judgment of conviction, following a jury trial, of possession of a narcotic substance with intent to sell in violation of General Statutes § 21a-278 (b),[1] and possession of a narcotic substance with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b).[2] On appeal, the defendant claims that the

[1] General Statutes § 21a-278 (b) provides in relevant part: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. . . ."

[2] General Statutes § 21a-278a (b) provides: "Any person who violates section 21a-277 or 21a-278 by manufacturing, distributing, selling, prescribing, dispensing, compounding, transporting with the intent to sell or dispense, possessing with the intent to sell or dispense, offering, giving or administering to another person any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a

trial court improperly: (1) determined that a warrantless search of his person did not violate his constitutional right to be free from unreasonable searches and seizures under the fourth amendment to the United States constitution;[3] (2) admitted testimony of the state's expert witness on narcotics transactions; and (3) denied the defendant's motion for a mistrial after a police officer had testified that he recognized the defendant from a "previous related police intervention . . . ."[4] We

licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278. To constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place. For the purposes of this subsection, 'public housing project' means dwelling accommodations operated as a state or federally subsidized multifamily housing project by a housing authority, nonprofit corporation or municipal developer, as defined in section 8-39, pursuant to chapter 128 or by the Connecticut Housing Authority pursuant to chapter 129."

[3] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[4] The defendant also asserts that the warrantless search of his person violated his constitutional right to be free of unreasonable searches and seizures under article first, §§ 7 and 9, of the Connecticut constitution; and that the denial of his motion for a mistrial due to the recognition testimony of the police officer deprived him of his right to a fair trial in violation of his due process rights under article first, § 8, of the Connecticut constitution. To the extent that the defendant suggests that article first, §§ 7, 8 and 9, of the Connecticut constitution provide even greater protection than the federal counterpart, we note that he has failed to provide an adequate independent

reject these claims and, accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On March 14, 2002, New Haven police officers Douglas Harkins, Anthony Maio[5] and David Runlett organized a narcotics surveillance operation in the Kensington Street section of New Haven. During the surveillance, Harkins had an unobstructed view of that area through a camera mounted on a building at the corner of Chapel and Kensington Streets. At approximately 5 o'clock in the evening, Harkins observed a male whom he described to be black and wearing a black winter hat and coat, a yellow T-shirt, blue jeans and work boots. The male, later identified as the defendant, had been walking south on the Kensington Street sidewalk when he stopped and waved to a woman who had been walking north on the opposite side of the street. The woman crossed the street, the two engaged in a short conversation, and the woman handed a small item to

legal analysis of the basis of this claim. We therefore "decline to reach the defendant's state constitutional claim . . . because it was inadequately briefed pursuant to the standard this court enunciated in *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992). As we concluded in *Geisler*, [i]n order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis should be considered to the extent applicable: (1) the textual approach . . . (2) holdings and dicta of this court . . . (3) federal precedent . . . (4) sister state decisions or sibling approach . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/ sociological considerations. . . . Id., 684–85. We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the [plaintiff] has provided an independent analysis under the particular provisions of the state constitution at issue." (Internal quotation marks omitted.) *Aselton* v. *East Hartford*, 277 Conn. 120, 153, 890 A.2d 1250 (2006). The defendant has not recognized, nor has he applied the six *Geisler* factors, and we therefore address his claims only under the relevant amendments to the United States constitution.

[5] Officer Anthony Maio is identified as both "Maio" and "DeMaio" in the state's brief. Because it is consistent with the defendant's usage, we presume that "Maio" is the proper name.

the defendant, which he placed in his left front pants pocket. He then reached down into the area of his left boot and pulled out a plastic bag. The defendant reached into the bag, retrieved a small item and handed it to the woman, who then walked back across the street. A few seconds later, Harkins observed a man approach the defendant, and he again saw the defendant take a small item from the other person and place it in his left front pants pocket before reaching into his work boot and retrieving a plastic bag. Harkins again observed the defendant take a small item from the plastic bag and give it to the other man before the two parted company.

Harkins then relayed his observations to Maio and Runlett, who in turn proceeded in a patrol car to the area where Harkins last had seen the defendant, walking north on Kensington Street toward Edgewood Avenue. Runlett and Maio drove down Edgewood Avenue until they saw the defendant, the only person in the area who matched the description given by Harkins.

The officers stopped the defendant and handcuffed him. The defendant offered verbal resistance, and a group of approximately fifteen to twenty people began to gather in the area. Runlett started to pat down[6] the defendant, frisking only the upper half of his body, but then decided to remove the defendant from the area. Runlett and Maio placed the defendant, still handcuffed, in the patrol car and drove him one-half block away to a police substation; the trip took approximately thirty seconds. Upon arriving, they placed the defendant, still handcuffed, in a chair in the lobby of the substation,

---

[6] A patdown or frisk occurs when the officer limits the search to an open, flat-handed patdown of the exterior of a suspect's clothing for weapons and does not manipulate the object that he discovers or otherwise extend the scope of the search. See *State* v. *Trine*, 236 Conn. 216, 227, 673 A.2d 1098 (1996); see also *Minnesota* v. *Dickerson*, 508 U.S. 366, 373, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993).

whereupon Runlett continued the patdown. During this procedure, Runlett heard a crinkling sound and detected an item near the top of the defendant's left boot. He withdrew a plastic bag containing thirty-eight smaller pink-tinted, Ziploc style baggies holding a white rock-like substance that Runlett believed to be crack cocaine. Runlett then continued to search the defendant and found $319 in his left front coat pocket. Following a positive field test of the substance seized by the police indicating that it was in fact narcotics, Harkins and Runlett arrested the defendant.

The record reveals the following procedural history. The state charged the defendant with possession of a narcotic substance with intent to sell in violation of § 21a-278 (b) and possession of a narcotic substance with intent to sell within 1500 feet of a school in violation of § 21a-278a (b). Before trial, the defendant filed a motion to suppress the evidence seized from him on the ground that it had been obtained illegally as the result of an unconstitutional search.[7] The trial court conducted a full evidentiary hearing on the motion to suppress, during which Harkins and Runlett testified for the state.

The trial court then denied the defendant's motion to suppress. In so doing, the trial court concluded that a reasonable and articulable suspicion had existed sufficient to allow for a warrantless search of the defendant. The court credited the testimony of the officers that the hand-to-hand exchanges that they had observed

[7] After the defendant filed his initial motion to suppress the evidence seized, he subsequently filed two supplemental motions to suppress, the latter predicated on testimony elicited at the hearing on the motion to suppress, when apparently for the first time defense counsel discovered that the police had transported the defendant to the police substation and continued the search of the defendant at that location. The second supplemental motion to suppress added the claim that the defendant's transfer to the police substation had exceeded the scope of a permissible investigative stop.

were consistent with street-level narcotics transactions, that narcotics dealers often are armed and work with others who are in the immediate vicinity, and that the defendant was stopped in a high crime area. The trial court found that, as a crowd continued to gather, a serious risk to the safety of the officers, as well as the defendant, had developed.

The trial court also concluded that the officers had not exceeded the permissible limits of an investigative stop when they transported the defendant in the patrol car for approximately thirty seconds to the police substation. The court's conclusion was based on its findings that: the officers had responded immediately to detain the defendant after observing him engage in two hand-to-hand transactions that were consistent with narcotics sales; the officers had met with immediate verbal resistance from the defendant when attempting to stop him; a crowd had gathered around the two officers performing the investigative detention and thereby created a safety risk; the patdown was for the limited purpose of finding weapons; a complete patdown could not have been conducted at the location of the initial stop; and the movement of the defendant to the lobby of the police substation was slight. On the basis of the totality of the circumstances, the trial court reasoned that the seizure was neither excessive in duration nor open-ended in length.[8]

During the trial, the state presented testimony from Harkins, Runlett and Maio concerning their observation, search and arrest of the defendant. During the course of his testimony, Maio stated that he was familiar with the defendant "[f]rom previous police related inter-

[8] The trial court also found meritless the defendant's claim that the officers had violated the "plain feel" or "plain touch" doctrine, which allows a warrantless seizure of nonthreatening contraband that has been detected during a valid patdown. The defendant has not challenged this conclusion on appeal.

vention in the area in the past." The state also presented expert testimony from New Haven police detective Michael Wuchek regarding street level distribution and purchase of narcotics generally.

The jury returned a verdict of guilty on both counts. Thereafter, the trial court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective sentence of twenty years, with eight years being mandatory. This appeal followed.[9]

I

CONSTITUTIONALITY OF THE SEARCH
AND SEIZURE

We first address the defendant's claim that the trial court improperly determined that the warrantless search of his person did not violate the defendant's constitutional right to be free from unreasonable searches and seizures under the fourth amendment to the United States constitution. Specifically, the defendant contends that the trial court improperly denied his motions to suppress the seized cocaine as the fruit of an unlawful search because: (1) the police officers did not have a reasonable and articulable suspicion that the defendant was armed and dangerous to justify the patdown; (2) the officers exceeded the scope of a permissible investigatory stop, thereby making a de facto illegal arrest when they handcuffed the defendant and transported him to the police substation; and (3) the patdown at the police substation exceeded the scope of a reasonable search. We disagree.

Before turning to the merits of the defendant's search and seizure claims, we set forth the standard of review applied to a trial court's findings and conclusions in

_____

[9] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

connection with a warrantless search. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Mann*, 271 Conn. 300, 323, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005). The burden, however, is on the state to establish the facts that justify the application of an exception to the warrant requirement. See, e.g., *State* v. *Aviles*, 277 Conn. 281, 292, 891 A.2d 935 (2006); see also *State* v. *Badgett*, 200 Conn. 412, 424, 512 A.2d 160 (1986) ("[t]hese exceptions 'have been jealously and carefully drawn' . . . and the burden is on the state to establish the exception" [citation omitted]), cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); *State* v. *Holmes*, 51 Conn. App. 217, 220, 721 A.2d 1195 (1998) ("[b]ecause a warrantless search is presumptively invalid, the state has the burden of affirmatively demonstrating a recognized exception to the warrant requirement"), cert. denied, 248 Conn. 904, 731 A.2d 309 (1999).

A

Reasonable and Articulable Suspicion that the Suspect Was Armed and Dangerous

We begin by noting what is not at issue. The defendant does not dispute that the initial investigative stop was based on a reasonable and articulable suspicion that he had committed or was about to commit a crime. He also does not challenge the trial court's findings of fact in support of its conclusion that the police officers had a reasonable suspicion that the defendant may have

been armed and dangerous.[10] Rather, the defendant challenges the trial court's conclusion that the patdown of his person was a reasonably warranted intrusion. Specifically, the defendant claims that, pursuant to *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and its progeny, the police must have a reasonable and articulable suspicion that a suspect is armed and dangerous before they may commence a search during an investigative stop. The defendant further contends that, because the sole basis for searching the defendant was Runlett's belief that drug dealers are known to carry guns, the police lacked the necessary reasonable suspicion to justify the search.

In response, the state claims that the correlation between drug dealing and firearms has been recognized in Connecticut and other jurisdictions as a significant factor in determining whether an officer's belief that a defendant may be armed and dangerous is reasonable. Moreover, the state asserts that our courts never have held that the police need more than a reasonable suspicion that a suspect is involved in drug dealing in order to justify a patdown. The state further contends that there were additional factors in the present case that established that, under the totality of the circumstances, the police had a reasonable suspicion that the defendant was armed and dangerous when they patted him down. We agree that the totality of the facts found to be credible by the trial court rise to the necessary reasonable and articulable suspicion that the defendant was armed and dangerous.

---

[10] The defendant does not dispute that a crowd gathered but does dispute, however, the trial court's finding that the crowd gathered as a result of his verbal resistance and that his removal from the scene was due to safety concerns created by the crowd. These disputed facts are not pertinent to the trial court's conclusion as to the reasonableness of the initial patdown and we address them in part I B of this opinion, wherein those facts are relevant.

It is axiomatic that "[t]he Fourth Amendment, made applicable to the States by way of the Fourteenth Amendment . . . guarantees [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Time and again, [the United States Supreme] Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." (Citation omitted; internal quotation marks omitted.) *Minnesota* v. *Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). One such exception that may be claimed by the state "was recognized in *Terry* v. *Ohio*, [supra] 392 U.S. 1 . . . which held that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions." (Internal quotation marks omitted.) *Minnesota* v. *Dickerson*, supra, 372–73.

It is well established, however, that "[t]he police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron* v. *New York*, 392 U.S. 40, 64, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968) ("suspect's mere act of talking with a number of known narcotics addicts over an eight-hour period no more gives rise to reasonable fear of life or limb on the part of the police officer

than it justifies an arrest for committing a crime"). The authority to permit a reasonable search for weapons for the protection of the police officer is "narrowly drawn" applying only "where he has reason to believe that he is dealing with an armed and dangerous individual . . . . The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." (Citations omitted.) *Terry* v. *Ohio,* supra, 392 U.S. 27.

In other words, "a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. . . . If, during the course of a lawful investigatory detention, the officer reasonably believes that the detained individual might be armed and dangerous, the officer may undertake a patdown search of the individual to discover weapons. . . . *State* v. *Kyles,* 221 Conn. 643, 661, 607 A.2d 355 (1992); *State* v. *Williams,* 157 Conn. 114, 118–19, 249 A.2d 245 (1968), cert. denied, 395 U.S. 927, 89 S. Ct. 1783, 23 L. Ed. 2d 244 (1969)." (Citations omitted.) *State* v. *Trine,* 236 Conn. 216, 223–24, 673 A.2d 1098 (1996); see also id., 245 (*Berdon, J.,* dissenting) ("Simply because a *Terry* stop is permitted, however, does not necessarily mean that there is a justification for a patdown. Before an individual may be patted down, which is far more intrusive of a person's privacy, the officer must also have a reasonable belief that the individual is armed and dangerous. *Minnesota* v. *Dickerson,* supra, [508 U.S. 366].")); 4 W. LaFave,

Search and Seizure (4th Ed. 2004) § 9.6 (a), p. 624 ("whether it is proper to make a protective search incident to a stopping for investigation is a question separate from the issue of whether it is permissible to stop the suspect; not all stops call for a frisk"). Thus, we agree with the defendant that the police must have a reasonable and articulable suspicion that a suspect is armed and dangerous before they may commence a protective patdown search during an investigative stop.

Turning to the question of whether the trial court properly found that the necessary reasonable suspicion did exist, we note that "[a]ny inquiry into the permissible justification for, and boundaries of, a particular investigatory detention and patdown search is necessarily factbound. *State* v. *Trine*, supra, 236 Conn. 224. Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . *State* v. *Lipscomb*, 258 Conn. 68, 75, 779 A.2d 88 (2001)." (Internal quotation marks omitted.) *State* v. *Mann*, supra, 271 Conn. 323.

"Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped . . . ." *United States* v. *Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

In the matter presently before us, the trial court found that Harkins and Runlett had extensive experience and training in narcotics investigation and enforcement. The court credited the officers' testimony that: the stop had taken place in a high crime area at approximately 5 p.m. in March; they had observed the defendant engaged in hand-to-hand exchanges on two separate occasions; this behavior was consistent with narcotics transactions in which the defendant was a dealer; and narcotics dealers often are armed and work with others who are in the immediate vicinity. The court also found that the defendant immediately upon being stopped had engaged in verbal resistance toward the officers. These facts, and the reasonable inferences that can be drawn therefrom, support the trial court's conclusion that Runlett had a reasonable and articulable suspicion that the defendant might have been armed and dangerous.

With respect to the trial court's reliance on testimony that a stop took place around dusk in a high crime area and that a crowd gathered during the stop, the United States Supreme Court has "noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis." *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000); see also *United States* v. *Mayo*, 361 F.3d 802, 807 (4th Cir. 2004) (fact that stop and frisk occurred in high crime area targeted for special enforcement by city is one factor considered to determine reasonable suspicion based totality of circumstances); *United States* v. *Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) ("officer may also consider whether the location of the stop is a 'high crime area' "); *State* v. *Tuck*, 90 Conn. App. 872, 881, 879 A.2d 553 (2005) (although mere presence of defendant in high narcotics trafficking area does not itself justify patdown, defendant's presence in high drug trafficking area is one factor considered

when determining if officers had reasonable suspicion suspect was armed and dangerous).

With respect to the trial court's reliance on testimony that suspects trafficking in narcotics often work with others who are in the immediate vicinity, courts have recognized that, "[a]lso relevant [to the totality matrix] are those inferences and deductions made by officers under the particular circumstances, since law enforcement officials are trained to cull significance from behavior that would appear innocent to the untrained observer." (Internal quotation marks omitted.) *United States* v. *Bailey*, 417 F.3d 873, 877 (8th Cir. 2005); see also *United States* v. *Orozco*, 191 F.3d 578, 581 (5th Cir. 1999) (previous experience in detecting illegal activity one of eight factors to be considered when determining existence of reasonable suspicion for investigatory stop of vehicle), cert. denied, 528 U.S. 1144, 120 S. Ct. 996, 145 L. Ed. 2d 943 (2000); *United States* v. *Kikumura*, 698 F. Sup. 546, 558 (D.N.J. 1988) (when trained police officer's relevant experience is added to totality of circumstances, brief stop of limited intrusiveness justified), rev'd in part on other grounds, 918 F.2d 1084 (3d Cir. 1990).

The trial court also found that, after observing the defendant engage in a series of activities that were consistent with dealing narcotics, the officers reasonably had believed that the defendant may be dangerous because, in their experience, narcotics dealers often are armed. This court previously has affirmed as lawful warrantless searches when one of the factors considered in the trial court's totality analysis was the inference that persons involved in selling narcotics may be armed. See, e.g., *State* v. *Mann*, supra, 271 Conn. 325 (correlation between trafficking of crack cocaine and weapons one of factors considered in analyzing warrantless search of suspected dealer); *State* v. *Clark*, 255 Conn. 268, 284, 764 A.2d 1251 (2001) (same); see also

*State* v. *Trine,* supra, 236 Conn. 225–26 (execution of warrant to search for narcotics is kind of transaction that may give rise to sudden violence).

Finally, the trial court credited testimony that the defendant, upon being stopped, had reacted immediately with verbal resistance. Both Connecticut and federal courts have recognized that a suspect's reaction to the police may be one factor considered in the totality analysis. See, e.g., *State* v. *Clark,* supra, 255 Conn. 285 (nervous and uncomfortable reaction to police interaction factor considered); see also *State* v. *Wylie,* 10 Conn. App. 683, 687, 525 A.2d 528 ("'The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness.' *United States* v. *Harley,* 682 F.2d 398, 402 [2d Cir. 1982]."), cert. denied, 204 Conn. 807, 528 A.2d 1154 (1987).

Taking into account the totality of the circumstances, we conclude that the trial court properly concluded that the detaining officers had a particularized and objective basis for suspecting that the defendant may have been armed and dangerous. Thus, in light of the facts found by the trial court, the court properly determined that the patdown search for weapons was constitutionally valid.

The defendant, however, maintains that the sole basis for the patdown was the officers' generalized belief that drug dealers are known to carry guns. Although we agree with the defendant that a particularized and objective basis for suspecting that the defendant may be armed and dangerous is required, we are not persuaded by the argument that no such basis existed. As our foregoing analysis has demonstrated, there were specific reasonable inferences that the officers in the present matter were entitled to draw from the facts in light of their experience. The officers did not conclude that

simply because the defendant was suspected to be involved in dealing drugs, he was armed. Rather, as we have noted, there were several factors that further supported their suspicion.

The cases cited by the defendant in support of his contention are inapposite. In these cases, the police either did not have a particularized and reasonable suspicion that the defendant was involved in dealing drugs or did not have other circumstances present to bolster their concern that the suspect may be armed. In *United States* v. *Atkins*, United States District Court for the Eastern District of Pennsylvania, Docket No. 99-633, 2000 WL 781439, *1 (June 5, 2000), the police conducted a patdown search of that defendant because the officer had suspected him of dealing drugs based solely on his frequent presence in a drug-infested area. The police officer admitted that he never had actually seen the defendant handling, carrying, selling, delivering, or using any narcotics prior to the events in question or heard that any other people had witnessed him engaging in such behavior. Id. Moreover, when the officer pulled the defendant over after seeing him drive past the patrol car, the defendant's behavior was deemed "entirely appropriate." Id., *3; see also *State* v. *Dollard*, 788 A.2d 1283, 1290 (Del. Super. 2001) (state conceded only appreciable threat to officer safety was detective's knowledge that drug dealers often carry weapon; area of stop well lit and just off public street; back up units were present; defendant did not act nervously or otherwise inappropriately, make any threatening or evasive gestures, nor give officers any reason to be concerned for safety; no obvious signs of potential weapon on defendant's person); *Harris* v. *State*, 827 S.W.2d 49, 50 (Tex. App. 1992) (search unlawful where only generalized belief that car passenger of suspected drug dealer may be dangerous).

Unlike the situations presented in those cases cited by the defendant, the case presently before us clearly demonstrates a totality of facts to support a reasonable and articulable suspicion that the defendant may have been armed and dangerous. The officers more than once had observed the distinctive behavior of the defendant accepting items in exchange for other items that he stored in a plastic bag in his boot; this in turn led to a high degree of suspicion of a specific person; the stop occurred in a high crime area, at dusk, surrounded by a gathering crowd; and the defendant reacted with verbal resistance. Accordingly, we conclude that the trial court properly determined that there was a reasonable and articulable suspicion that the defendant may have been armed and dangerous.

B

Transportation of the Defendant to the Police Substation

We next turn to the defendant's contention that the trial court improperly concluded that the officers had not exceeded the scope of a permissible *Terry* investigative stop when they transported the defendant to the police substation. The defendant challenges two of the trial court's factual findings supporting its conclusion, as well as the court's ultimate legal conclusion. Specifically, the defendant challenges the court's findings that the defendant's verbal resistance upon being stopped caused a crowd to form and that the police could not complete the patdown because of the on-lookers. The defendant contends that Runlett testified that he and Maio had moved the defendant, not because the crowd was unruly or interfering, but because it was police protocol to remove suspects to the police substation. The defendant further contends that Runlett attributed the formation of the crowd to general curiosity, rather than the defendant's verbal resistance. Finally, the

defendant claims that the trial court's ruling was improper because the officers had exceeded the scope of a permissible investigative stop and placed him under de facto arrest, as a matter of law, when they handcuffed him, placed him in the patrol car and transported him to the police substation.[11] We disagree with both the defendant's factual and legal claims.

Due to the fact bound nature of inquiries in this area, we first address the defendant's challenges to the factual findings. In doing so, we are mindful that "[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *State* v. *March*, 265 Conn. 697, 711, 830 A.2d 212 (2003).

In its memorandum of decision, the trial court found that, when stopped by Runlett and Maio, the "defendant immediately engaged in verbal resistance toward the officers, which caused a crowd of approximately twenty people to start to form around the officers and the defendant. . . . Runlett attempted to conduct a *Terry* patdown for officer safety . . . [but] was unable to complete the patdown because of the crowd that was gathering around them."

Turning to the record, we note that, at the suppression hearing, Runlett offered the following testimony. As a general matter, anytime police conduct a stop in a high crime area, people want to observe. When Runlett and Maio stopped the defendant, they "[i]mmediately met with verbal resistance." Runlett and Maio were unable to complete a patdown because a crowd began to form and, with only two officers present and people

---

[11] The state conceded, at oral argument before this court, that the officers did not have probable cause to arrest the defendant prior to the patdown.

surrounding them, the officers did not know if anyone was going to try to divert the officers' attention, if anyone in the crowd had a gun, or if anyone was going to "jump us." In response to defense counsel's subsequent question as to whether it was police "procedure" to handcuff a detainee "in this type of circumstance," Runlett responded affirmatively, explaining that officers would do so "for our safety as well as [the detainee's]," given that, when drugs are involved, guns often are present. In response to defense counsel's further question as to whether "it is common practice for an investigative detainer in that situation to take [the detainee] to the substation," Runlett responded: "I've been involved in . . . many takedowns. The whole idea of a takedown is speed, element of surprise, out of the area, that way you don't spook any other alleged dealers in the area. They don't see what's going on. You get the subject out of the area quick and safe."[12]

---

[12] Specifically, the following exchange took place at the suppression hearing between defense counsel and Runlett:

"Q. Was [the defendant] under arrest at that time?

"A. Investigative detainment.

"Q. Okay. And it's—is it your procedure to handcuff someone when they are under detainment in this type of circumstance?

"A. In this type of circumstance?

"Q. Yeah.

"A. For our safety as well as his, yes.

"Q. Okay.

"A. The important part you have to remember is safety.

"Q. Oh, I—I understand—

"A. Okay.

"Q.—definitely.

"A. All right. We don't know what he has, what he doesn't have. We don't know. And, again, I'll stress it again, when there's drugs, there's guns; and when there's guns, there's drugs.

"Q. But there was no gun in this case; is that true?

"A. There was no gun in this case, correct.

"Q. Okay. And then you indicated that about a minute, a minute and a half you put him in the cruiser and then very shortly thereafter—

"A. Within—

"Q.—is that safe to say—

"A.—thirty seconds he was right down at [police district number 4].

Given this record, we cannot conclude that either of the trial court's factual findings were clearly erroneous. The trial court was not required to adopt the interpretation advocated by the defendant, that the decision to handcuff and transport him was the result of a generic protocol unrelated to the specific facts of the case, rather than the state's justification that the officers were concerned for safety. "This court cannot sift and weigh evidence." (Internal quotation marks omitted.) *State* v. *Trine*, supra, 236 Conn. 227.

We thus turn to the question of whether, in light of the factual findings of the trial court, the officers exceeded the scope of a permissible investigative stop, as a matter of law, when they transported the defendant to the police substation. As we previously have noted, in ascertaining whether a reasonable and articulable suspicion existed for the search, " 'the totality of the circumstances—the whole picture—must be taken into account.' " *State* v. *Mann*, supra, 271 Conn. 323. When engaging in a fourth amendment reasonableness inquiry, we ask, "would the facts available to the officer at the moment of the seizure or the search warrant a [person] reasonable caution in the belief that the action taken was appropriate?" (Internal quotation marks

"Q. Okay. At—

"A.—Substation.

"Q.—that time was he under arrest?

"A. At that time? No, he was only under arrest once the items were located. At that time then he was placed under arrest.

"Q. Is it common practice for an investigative detainer in that situation to take them to the substation?

"A. As far [as] our—our protocol within [police district number four], how we handle things, yes.

"Q. Okay.

"A. All right. Because we've done—I've been involved in many. And I can . . . tell you, many takedowns. The whole idea of a takedown is speed, element of surprise, out of the area, that way you don't spook any other alleged dealers in the area. They don't see what's going on. You get the subject out of the area quick and safe."

omitted.) *United States* v. *Newton*, 369 F.3d 659, 673–74 (2d Cir.), cert. denied, 543 U.S. 947, 125 S. Ct. 371, 160 L. Ed. 2d 262 (2004); id., 675 (seizure not de facto arrest under fourth amendment when it lasted only few minutes, occurred at residence rather than police station and resulted from reasonable suspicion suspect was armed and dangerous). "[T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means reasonably available to effect their legitimate investigative purposes. . . . At the same time, however, the law recognizes the important need to allow authorities to graduate their responses to the demands of any particular situation." (Citations omitted; internal quotation marks omitted.) Id., 674.

It has long been acknowledged that "a limited frisk incident to a lawful stop must often be rapid and routine. There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet." *Terry* v. *Ohio*, supra, 392 U.S. 33 (Harlan, J., concurring). "[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officer to take necessary measures . . . to neutralize the threat without converting a reasonable stop into a de facto arrest. . . . This doctrine has supported a range of restraints incident to a stop, from the pat-down at issue in *Terry*, to the drawing of firearms . . . to the use of handcuffs, see *United States* v. *Esieke*, 940 F.2d 29, 36 [(2d Cir.)] (holding that use of handcuffs and leg irons to restrain suspected alimentary canal smuggler did not convert his border detention into an arrest) [cert. denied, 502 U.S. 992, 112 S. Ct. 610, 116 L. Ed. 2d 632 (1991)]; see also *Flowers* v. *Fiore*, [359 F.3d 24, 30 (1st Cir. 2004)]; *United States* v. *Pratt*, 355 F.3d 1119,

1123 (8th Cir. 2004); *Meredith* v. *Erath*, 342 F.3d 1057, 1062–63 (9th Cir. 2003); *United States* v. *Hamlin*, 319 F.3d 666, 671 (4th Cir. 2003); *United States* v. *Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002); *United States* v. *Jordan*, 232 F.3d 447, 449 (5th Cir. 2000); *United States* v. *Gil*, 204 F.3d 1347, 1351 [(11th Cir.), cert. denied, 531 U.S. 951, 121 S. Ct. 357, 148 L. Ed. 2d 287 (2000)]; *Houston* v. *Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 815 (6th Cir. 1999); *United States* v. *James*, 40 F.3d 850, 875 (7th Cir. 1994), vacated on other grounds, 516 U.S. 1022, 116 S. Ct. 664, 133 L. Ed. 2d 515 (1995); *United States* v. *Jones*, 973 F.2d 928, 931 (D.C. Cir.), [reh.] granted and opinion vacated in part on other grounds, 980 F.2d 746 (D.C. Cir. 1992)." (Citations omitted; internal quotation marks omitted.) *United States* v. *Newton*, supra, 369 F.3d 674–75; see also *State* v. *Weaver*, 85 Conn. App. 329, 335, 857 A.2d 376 (fact that officers took security measures by drawing weapons, performing patdown, handcuffing and placing robbery suspect in police cruiser in order to transport 300 feet to more secure location did not transform detention into arrest), cert. denied, 271 Conn. 942, 861 A.2d 517 (2004).

Similarly, this court has noted, "requiring a suspect to accompany a police officer to another place . . . does not necessarily transform what would otherwise be a permissible investigatory seizure into an arrest. See *United States* v. *Short*, [570 F.2d 1051, 1054 (D.C. Cir. 1978)]; *People* v. *Stevens*, 183 Colo. 399, 407, 517 P.2d 1336 [1973]; *State* v. *Griffin*, 459 A.2d 1086, 1089–90 (Me. 1983) . . . ." (Citation omitted.) *State* v. *Mitchell*, 204 Conn. 187, 199, 527 A.2d 1168 (transporting defendants to hospital for viewing by victim did not exceed permissible scope of investigative detention), cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987); see also *Florida* v. *Royer*, 460 U.S. 491, 504–505, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) ("there are undoubtedly reasons of safety and security that would

justify moving a suspect from one location to another during an investigatory detention").

As we have noted previously herein, any inquiry into permissible boundaries of a particular protective patdown search is necessarily fact bound. In the present case, the trial court found that the officers had met with immediate verbal resistance from the defendant when they attempted to stop him, that a crowd immediately had gathered around the two officers performing the investigative detention and had put them at risk for their safety, that a complete patdown could not have been conducted at the location of the initial stop, and that the movement of the defendant to the lobby of the police substation had been slight.

We agree with the trial court that, under the totality of these circumstances, handcuffing and removing the defendant to a secure location one-half block away from the gathering crowd did not, as a matter of law, exceed the permissible scope of an investigative stop and protective patdown. Indeed, "[w]e do not require police officers who are properly attempting to neutralize the threat of physical harm to do so at increased peril." *State* v. *Wilkins*, 240 Conn. 489, 501–502, 692 A.2d 1233 (1997).

Nonetheless, the defendant specifically contends that the police could not bring him to the police station as part of an investigative detention. We agree with the general proposition that it would not be within the narrow scope of a permissible investigative stop to handcuff and transport a detainee to a police station solely for the purpose of interrogation. See, e.g., *State* v. *Edwards*, 214 Conn. 57, 70–71, 570 A.2d 193 (1990) (New Jersey police exceeded scope of *Terry* stop by transporting defendant in handcuffs from apartment to police headquarters, seizing jewelry as evidence from his body, and holding him overnight until Connecticut

police could arrive and question him). We need not address, however, under the facts of this case, whether it would have been within the scope of an investigative stop to transport the defendant solely for interrogation nor whether removal of the defendant would have been reasonable absent the formation of the crowd, the gathering of which the trial court found to raise safety concerns. Accordingly, we conclude that the trial court properly found that the officers' actions were objectively reasonable on the basis of safety concerns, making the removal of the defendant a short distance to the lobby of the police substation reasonable.

C

Search of the Defendant after His Removal to the
Police Substation

We now turn to the defendant's final challenge to the investigative stop and protective patdown, namely, that the patdown conducted after his removal to the police substation exceeded the scope of a justifiable search. The defendant claims that the patdown was impermissible because he was handcuffed, thus posing no danger to the officers at the substation, and because the officers already had conducted a patdown, which had produced no weapons. The defendant in essence concedes that he did not raise this issue in the trial court, but seeks to prevail on his claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[13] We conclude that the

---

[13] "Under [*State* v. *Golding*, supra, 213 Conn. 239–40], a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Estrella*, 277 Conn. 458, 468 n.15, 893 A.2d 348 (2006).

defendant's claim is reviewable, but that he ultimately cannot prevail.[14]

As an initial matter, we note that the record is adequate to review the defendant's claim that the patdown conducted after his removal to the police substation, while he was still in handcuffs, exceeded the scope of a reasonable search because he was no longer a danger to the officers. We also conclude that the claim is of constitutional magnitude but, we nevertheless conclude that the defendant's constitutional rights were not violated.

Federal courts have rejected arguments that "a frisk was invalid because the suspect was already in handcuffs with respect to a *Terry* stop. [The courts have] recognized that suspects in handcuffs can remain a danger to the police, particularly when weapons are present. . . . As a result, [they have] held that the danger justified a pat-down to secure the officer's safety." (Citation omitted.) *United States* v. *Wallen*, 388 F.3d 161, 166 (5th Cir. 2004), cert. denied, 544 U.S. 967, 125 S. Ct. 1747, 161 L. Ed. 2d 613 (2005). "[T]he fear of a person's gaining immediate control of weapons does not limit itself to the time of the stop, but extends through the entire interaction between him and the officer[s]. In [*Michigan* v. *Long*, 463 U.S. 1032, 1051–52, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983)], the [United States Supreme] Court identified a purpose of protec-

---

[14] It is not clear from the defendant's brief whether he also is asserting a second claim of impropriety with respect to the patdown at the police substation, namely, that the search was for narcotics, rather than weapons. To the extent that the defendant is asserting such an unpreserved claim and seeking *Golding* review, we conclude that, even if the record were adequate for such review, the claim has been briefed inadequately. The defendant cites an isolated portion of Runlett's testimony, relies on an ambiguity in that testimony to formulate his argument, and cites no case law or legal analysis in support of his claim. Accordingly, we decline to address this issue. See *Martel* v. *Metropolitan District Commission*, 275 Conn. 38, 51–52, 881 A.2d 194 (2005).

tive searches to be the concern that if the suspect is not placed under arrest, he will be permitted to . . . [go free], and he will then have access to any weapons . . . ." (Internal quotation marks omitted.) *United States* v. *Wallen*, supra, 166.

In the matter presently before us, the trial court found that the police officers had not been able safely to perform a complete patdown until they reached the lobby of the police substation with the handcuffed defendant. We cannot conclude that the officers, who had frisked only the upper half of the defendant's body before removing him to the lobby of the police substation, as a matter of law, did not have a reasonable and articulable belief that the defendant may have been armed and dangerous when they reinitiated the patdown.

The defendant cites *State* v. *Badgett*, supra, 200 Conn. 412, for the proposition that, although the police have a right to conduct a limited search for weapons for their own safety, when there is no danger to the officers, any additional search goes beyond the scope of a protective patdown under *Terry*. The defendant's claim rests on the assertion that he presented no danger to the officers because he was handcuffed and because they had performed a partial, unfruitful frisk for weapons at the scene of the stop. This court's holding in *Badgett*, however, is inapposite. In that case we addressed whether a warrantless search of a bag in an automobile was incident to arrest after that defendant had been handcuffed and removed from the scene. Id. In contrast, the warrantless search of the defendant in the present case, limited to a patdown of the outside of his clothes for weapons, occurred while the officers actively were engaged in the type of face-to-face investigatory exchange with the defendant that is permitted by *Terry*. As we have noted, the handcuffed defendant, if armed, still could have posed a danger to the officers. We are

not persuaded that a partial frisk of the upper body obviated the need for a full patdown to ensure that the defendant was not armed and dangerous, particularly when he had been observed using his boot area for storage. Therefore, we conclude that the full patdown of the defendant in the lobby of the police substation did not violate his rights under the fourth amendment to the United States constitution. We, accordingly, conclude that the trial court properly admitted into evidence at the trial the narcotics seized from the defendant.

## II

### EXPERT TESTIMONY REGARDING NARCOTICS TRANSACTIONS

We next turn to the defendant's claim regarding the admissibility of Detective Wuchek's expert testimony about the street level distribution of narcotics. Although the defendant does not dispute that Wuchek was qualified to testify as an expert on this matter, nor that experts can testify in narcotics trials, he contends that the trial court improperly admitted Wuchek's testimony because it was: (1) not helpful to the jury given the simple facts of the case; (2) cumulative of other testimony; and (3) more prejudicial than probative. The state contends that the trial court properly exercised its discretion in admitting Wuchek's expert testimony. We agree with the state.

The following additional facts are relevant to our analysis. In light of the fact that it was undisputed that the police officers had seized thirty-eight small bags of crack cocaine from the defendant's person, the defense theory presented at trial was that the defendant possessed the cocaine for personal consumption, rather than for sale to others. The defendant introduced testimony from a former employer to demonstrate that the money seized by the police could have been from the

paycheck that had been issued to him on the date of his arrest. Testimony also was elicited on cross-examination of a state's witness that a person conceivably could buy multiple bags of cocaine in order to reduce the risk involved in the purchase of illicit drugs.

As we noted previously, Officers Harkins, Runlett and Maio provided testimony at trial concerning their observation, search and arrest of the defendant. Specifically, Harkins testified that he believed that the defendant engaged in hand-to-hand narcotic transactions in an area known for drug dealing. He also testified that it was common for narcotic dealers to carry narcotics in a plastic bag and, on cross-examination, he testified that drugs usually were packed in small individual bags for sale. Maio identified the narcotics seized from the defendant as street level packaged crack cocaine ready for sale and described the money seized as the fruits of illicit street level distribution. He explained that he concentrated on arresting dealers rather than buyers and testified that when buyers are arrested, they typically have only one to four bags of drugs rather than twenty to forty.

Wuchek provided expert testimony concerning the practices of street level narcotics dealers, including whether possessing certain quantities of narcotics is consistent with the sale, rather than personal use, of the narcotics and how street level dealers sell narcotics and what type of packaging they generally use. Specifically, Wuchek testified to the following facts and observations. Street level narcotics dealers employ different methods when dealing: they may hide "bundles"[15] on their person or in a nearby location; and they may work alone or in teams, with someone assigned as a lookout

---

[15] Wuchek testified that a "bundle" consists of individually wrapped quantities of narcotics that are stored in a plastic bag, film container, a small tin breath mint container, cigarette pack or other similar container.

or to take the money while another person distributes the drugs. In New Haven, crack cocaine commonly is packaged in Ziploc bags of similar shape and size. An exchange of drugs for money, referred to as a hand-to-hand transaction, often happens quickly, with the buyer immediately departing and the seller remaining in the same general area. A typical street level purchase of crack cocaine would be a sale of between $20 to $40 and would involve one to four packets. Narcotics buyers usually do not carry large amounts of money or buy forty to fifty bags of narcotics at one time. A buyer who wanted to purchase a large quantity of crack cocaine would be more apt to purchase an "eight ball," which is approximately an eighth of an ounce and generally costs around $110 to $120, than to buy twenty-five or thirty individual $10 packets aggregating to the same weight but costing considerably more than the eight ball. Street level dealers typically keep their money organized in packets of $100 or with the various denominations individually rolled. Finally, Wuchek offered his opinion, in response to a hypothetical question posed by the state, that a person carrying twenty to thirty individually wrapped bags of narcotics and $200 to $300 on his or her person was more likely to be a dealer than a buyer.

Turning to the defendant's claims, he specifically contests the admission of Wuchek's testimony because he contends that it did not present any information that was not common knowledge to the average person and thus was not helpful to the jury in deciding whether the defendant possessed the drugs with the intent to sell. He further claims that the testimony was cumulative of the testimony of Runlett and Maio connecting the specific facts of the case to street level drug dealing practices. Finally, the defendant contends that the testimony was more prejudicial than probative because Wuchek essentially had offered an opinion on the sole

disputed issue at trial—whether the defendant possessed the cocaine with the intent to sell.

We begin our analysis of this claim by setting forth the standard by which we review the trial court's determinations concerning the admissibility of evidence. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Citations omitted; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 634, 881 A.2d 1005 (2005).

Connecticut courts have held that the "significance of the quantity of narcotics found on a suspect is not within the common knowledge of the average juror and, therefore, is a proper subject of expert testimony." *State* v. *Moore*, 34 Conn. App. 411, 415, 641 A.2d 804, cert. denied, 230 Conn. 914, 645 A.2d 1020 (1994). "The quantity of money seized from a defendant and the manner in which that money was folded or 'layered' is relevant to the issue of intent to sell. See *State* v. *Ruth*, 16 Conn. App. 148, 155, 547 A.2d 548 [cert. denied, 209 Conn. 827, 552 A.2d 434] (1988); *State* v. *Uribe*, 14 Conn. App. 388, 393–94, 540 A.2d 1081 (1988). It cannot be assumed . . . that information relating to the manner in which drug dealers layer money and the reasons for doing so is within the common knowledge of the average juror. See *State* v. *Grayton*, 163 Conn. 104, 111, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d

495 (1972)." *State* v. *Holeman*, 18 Conn. App. 175, 179, 556 A.2d 1052 (1989). Indeed, "[i]n *State* v. *Vilalastra*, 207 Conn. 35, 540 A.2d 42 (1988), and *State* v. *Williams*, 169 Conn. 322, 333–34, 363 A.2d 72 (1975), [this court] concluded that law enforcement personnel, testifying as experts, may properly give an opinion concerning the quantity of narcotics which a dealer might possess or the manner in which a drug might be transported by a dealer." (Internal quotation marks omitted.) *State* v. *Baldwin*, 224 Conn. 347, 361 n.6, 618 A.2d 513 (1993).

The challenged testimony offered by Wuchek is generally of the type that Connecticut courts consistently have found to be beyond the common knowledge of the average juror and, therefore, admissible. For example, we do not believe it can be said that the amount of crack cocaine typically purchased by a buyer, as well as the availability and comparative savings of bulk purchases, are common knowledge. Indeed, the defendant does not cite any Connecticut case law for the proposition that the testimony improperly was admitted because it is within the average jurors' ability and common knowledge to determine whether a person possessing thirty-eight small bags of cocaine intends to sell the narcotics or buys it in bulk to keep it for personal consumption.

We also disagree with the defendant that Wuchek's testimony should have been excluded because it was cumulative. Wuchek gave the jury the benefit of his experience with respect to the general habits of users and sellers of narcotics, the quantities commonly involved, the value of narcotics packaged like those found in the defendant's possession, the customary methods of packaging narcotics for retail, the availability and pricing of various amounts such as eight balls and dime bags, and observations of this nature. Such testimony allowed the jury to draw their own conclusions from the other testifying officers' factual observa-

tions. These matters were not rendered redundant by the testimony of the arresting officers regarding the observed hand-to-hand transactions. In fact, they are highly relevant when viewed through the lens of the defense theory that the thirty-eight bags of cocaine were for his personal consumption and that the cash was from a recent paycheck.

We also reject the defendant's claim that Wuchek's testimony was more prejudicial than probative. We note that, "[t]here are situations where the potential prejudicial effect of relevant evidence would suggest its exclusion. These are: (1) where the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Harris*, 277 Conn. 378, 391, 890 A.2d 559 (2006). We conclude that the expert testimony offered by Wuchek does not meet this standard. It contained nothing that would unduly arouse the fact finder's emotions. The testimony did not create a side issue or consume an undue amount of time, and the defendant certainly anticipated the evidence having received from the state a notice of intent to call the expert witness.

To the extent that Wuchek opined that, under a hypothetical set of facts similar to those at issue here, the conduct was more consistent with the sale of narcotics than the purchase of narcotics, we do not construe this testimony as an opinion as to the ultimate issue of fact. In *State* v. *Vilalastra*, supra, 207 Conn. 35, this court distinguished between expert opinions that relate to the defendant directly, which are improper, and opin-

ions that relate to the custom and trade of narcotic dealers generally, which are proper. Although it is improper for the state to usurp the role of the fact finder by eliciting testimony from an expert as to whether the defendant was a seller or user of drugs, it is entirely proper to inquire into the custom and practice of narcotics traffickers generally. Id., 43–45.

We are not persuaded by the case law of sister states cited by the defendant for the proposition that Wuchek's testimony was cumulative and unduly prejudicial. Indeed, the testimony at issue in several of the cases is inapposite to that at issue in the present case. For example, in *State* v. *Wheeler*, 416 So. 2d 78, 81 (La. 1982), the expert's testimony at issue in part addressed the reliability of the arresting officers' observations.[16] Notably, although the Louisiana court concluded that such testimony improperly had been admitted, it concluded that the expert properly testified that, as a general matter, it is common for marijuana distributors to carry revolvers, a matter deemed to be within the expert's special knowledge. Id., 82. Here, Wuchek testified as to street level dealing generally.

Similarly, in *People* v. *Hernandez*, 70 Cal. App. 3d 271, 138 Cal. Rptr. 675 (1977), the police officer's expert testimony as to whether a drug transaction had occurred was based on his observations of common, generic body language and inferences that he drew from

---

[16] Specifically, the court in *State* v. *Wheeler*, supra, 416 So. 2d 81, concluded that the lower court improperly had permitted a police officer to testify that, in his opinion, the defendant had been involved in the distribution of marijuana when, "[t]he officer was no more an expert than the jurors concerning the matters at issue in this case: the reliability of the arresting officers' observations that a man was engaged in passing out articles from a [store] shopping bag which he dumped in a trash can immediately before their approach; the officers' discovery of a substantial quantity of material later determined to be marijuana in individual containers inside the [store] bag; the officers' identity of the defendant as the same person who disposed of the [store's] bag and was later arrested."

those movements. See id., 280–81 (police officer's opinion based on bodily position and movements of participants during sidewalk conversation—fact that four people kept looking at area where defendant had his hands and that defendant shook his head from side to side when approached by two other persons). In the present case, Wuchek's testimony did not relate to general observations of the defendant's conduct, and to the extent that Wuchek's testimony encompassed some information as to basic movements by persons acting in the course of a drug transaction, this information was part of a broader mosaic. Accordingly, we conclude that the trial court properly admitted Wuchek's testimony.

## III

## PRIOR RECOGNITION TESTIMONY

The defendant's final claim is that the trial court abused its discretion by denying his motion for a mistrial after Maio testified at trial as to his familiarity with the defendant. The defendant contends that Maio's statement, in essence, was testimony about the defendant's prior criminal involvement with narcotics. The defendant further claims that, because the critical issue in his trial was whether he intended to sell the narcotics seized by the police, Maio's statement was clearly harmful and, therefore, deprived the defendant of his right to a fair trial by undermining the presumption of innocence in violation of his due process rights under the fifth, sixth and fourteenth amendments to the United States constitution. The state responds that there is no reasonable possibility that Maio's isolated comment deprived the defendant of a fair trial, particularly in light of the trial court's curative instruction. We agree with the state.

The following additional facts and procedural history inform our resolution of this issue. The defendant filed a

motion in limine seeking to exclude evidence of similar incidents or prior misconduct. During pretrial discussions, the state represented that the officers who would be testifying had worked previously in the relevant area and were familiar with the defendant. The state notified the court that this information would be a subject of testimony to the extent that it went to identification or lack of mistake. The state further represented that such references to familiarity would be direct, without reference to prior arrests, narcotics investigations or any acts of misconduct. Defense counsel did not object, instead stating that she specifically was seeking guidance on whether the state could introduce evidence about the defendant's parole status. Following the discussion, the court instructed the state to provide notice if it intended to reference the defendant's criminal record.

During the state's direct examination, Maio testified that he had been working in the area where he and Runlett stopped the defendant for at least six and one-half years and was familiar with some of the residents in the neighborhood. Immediately following Maio's later in-court identification of the defendant as the man he and Runlett had stopped, the following exchange occurred with the state's attorney and Maio:

"Q. Once you stopped and detained [the defendant], did you recognize [the defendant]?

"A. Yes I did.

"Q. How do you know [the defendant]?

"A. From previous related police intervention in the area in the past." The defendant objected and the trial court instructed the state's attorney to move on with its questioning.

After the jury had been dismissed for the day, the defendant made a motion for a mistrial based on Maio's

statement, arguing that Maio explicitly had referred to a similar previous incident with the defendant. The state argued that Maio's response had referred to his ability to identify the defendant and that the statement did not indicate that any prior interaction with the defendant was related to an arrest, conviction or any prior misconduct. The trial court denied the motion for mistrial, but, thereafter, gave the following curative instruction in its final charge to the jury: "Now there was testimony in this trial that one of the officers had prior knowledge or knew of the defendant before. The only purpose for which you are to use that testimony is in considering the identification and not for any other purpose. In short, you must consider the totality of the circumstances [affecting] the identification. Remember, you must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime or you must find him not guilty."

Before turning to the merits of the defendant's last claim, we note that "[t]he principles that govern our review of a trial court's ruling on a motion for a mistrial are well established. Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a [mistrial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a] mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Cook*, 262 Conn. 825, 842, 817 A.2d 670 (2003).

"In reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 416, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

Turning to the case at hand, we note that, "[a]s a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged." (Citation omitted; internal quotation marks omitted.) *State* v. *O'Neil*, 261 Conn. 49, 80, 801 A.2d 730 (2002). With regard to the allegedly improper statement, however, we first observe that Maio's testimony, that he knew the defendant "from previous related police intervention in the area in the past," is vague as to whether the defendant had engaged in any misconduct to prompt the police intervention. Maio's statement conceivably could have been a reference to a situation in which the defendant had been a victim, a witness or an innocent bystander.[17] Maio's statement does not reference explic-

---

[17] For similar reasons, we are not persuaded by the defendant's argument that, taking Maio's statement addressing familiarity in context with his other testimony regarding his police narcotics work in the area where the defendant was arrested, the jury could have ascribed no other meaning to "previous related police intervention" than that the defendant previously had been engaged in selling narcotics.

itly a notorious criminal past. Cf. *State* v. *Ferrone*, 97 Conn. 258, 267–68, 116 A. 336 (1922) (evidence that defendant had been convicted previously and served seven years in notorious prison had prejudicial effect). Nor does the statement reference specific facts concerning improper conduct by the defendant nor the specific legal consequences attendant to such conduct. See *State* v. *Talton*, 197 Conn. 280, 290–91, 497 A.2d 35 (1985) (not unduly prejudicial for court to inform jury, in response to officer's testimony that defendant had denied having prior arrest as evidence of consciousness of guilt, that defendant in fact previously had been arrested, given that there was "a mere reference to a prior arrest without any indication of a conviction, much less a long term of imprisonment . . . [and] neither the specific nature of the charge nor the underlying facts were put before the jury"). As the Appellate Court has noted, "[s]imply stated, [a] remark's lack of specificity leads us to conclude that the remark did not unfairly prejudice the defendant in the eyes of the jury." *State* v. *Boykin*, 74 Conn. App. 679, 687, 813 A.2d 143, cert. denied, 263 Conn. 901, 819 A.2d 837 (2003).

To the extent that the jury arguably could have interpreted the isolated statement to mean that the defendant had engaged in prior misconduct or even narcotics dealing and thus it potentially could have relied on that statement as improper propensity evidence, it is significant that the trial court provided a curative instruction to the jury. It is well established that, "[i]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions." (Internal quotation marks omitted.) *State* v. *Cook*, supra, 262 Conn. 844. The burden is on the defendant to establish that, in the context of the proceedings as a whole, the challenged testimony was so prejudicial, notwithstanding the court's curative instructions, that the jury reasonably cannot be pre-

sumed to have disregarded it. Id.; see also *State* v. *Doehrer*, 200 Conn. 642, 654, 513 A.2d 58 (1986) ("[a]ny possible prejudice stemming from the portion of the question that the jury did hear was cured by the prompt curative instruction and the further instruction given by the judge in his final charge"). The defendant in the present case has not met this burden. Given the ambiguity of the statement, the isolated nature of the passing reference and the curative instruction, we cannot conclude that an injustice occurred or that the trial court abused its discretion in denying the defendant's motion for a mistrial.

The judgment is affirmed.

In this opinion the other justices concurred.