******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANTHONY C.
MANOUSOS
(AC 39376)

Keller, Prescott and Beach, Js.

*Syllabus*

Convicted of the crime of arson in the first degree, the defendant appealed
to this court, claiming, inter alia, that the trial court improperly denied
his motions to suppress certain statements that he had made to the
police and items that were confiscated from him during an investigatory
stop and subsequent patdown of his person for weapons. The investiga-
tory stop and subsequent patdown were conducted after an officer on
patrol received a report from a police dispatcher reporting a fire and
that the man suspected of starting the fire had taken off in a certain
direction. The officer saw the defendant 300 yards from the scene of
the arson, asked him where he was coming from, and noticed that the
defendant was wearing only jeans and a T-shirt in chilly weather, and
that he was out of breath, perspiring and had a deer in headlights look
about him. The police handcuffed the defendant and performed the
patdown after they noticed a bulge in his front left pocket. The police
searched the pocket and found certain items, which were seized along
with a hooded sweatshirt and an umbrella that the defendant was car-
rying. *Held*:

1. The defendant could not prevail on his claim that the trial court improperly
   denied his motions to suppress the statements that he had made to the
   police and the items seized during the investigatory stop and patdown,
   which was based on his assertion that the police lacked a reasonable
   and articulable suspicion that he was involved in criminal activity:
   a. The trial court properly determined, under the totality of the circum-
   stances, that the police had a reasonable and articulable suspicion to
   conduct the investigatory stop; the defendant was in close proximity in
   time and space to the fire, he was the only person on foot in the area,
   he had a deer in headlights look about him when he saw the police
   officer who stopped him, which heightened the officer's suspicion, the
   officer's suspicion was further supported by his observations that the
   defendant was breathing heavily and perspiring, and was wearing only
   jeans and a T-shirt, despite chilly and rainy weather, and although the
   defendant's ethnicity and the color of his sweatshirt did not match the
   description of the suspect given by the dispatcher, those factors were
   unimportant in comparison to the factors that gave rise to a reasonable
   and articulable suspicion on the part of the officer.
   b. The limited patdown of the defendant for weapons was proper, as
   the totality of the circumstances supported the trial court's finding that
   the officers reasonably believed that he may have been armed and
   dangerous: the bulge in the defendant's pocket observed by the police
   was strong justification for the patdown, as it indicated that the defen-
   dant may have been carrying a weapon, the officers had reason to
   suspect that the defendant had set a house on fire while someone was
   inside the house and then fled, the fact that the defendant was hand-
   cuffed during the patdown did not automatically render it unlawful, and
   his cooperation with the police during the patdown did not undermine
   its legality, as a handcuffed suspect may still present a danger to the
   police; moreover, because the investigatory stop and patdown were
   proper, the seizure of the items from the defendant's pocket as well as
   his sweatshirt and umbrella was warranted, it having been reasonable
   for the police to enlarge the scope of the search by detaining the defen-
   dant for a showup identification and seizing the items he was carrying,
   and, therefore, the defendant's claim that his subsequent statements to
   the police should not have been admitted into evidence as fruit of the
   poisonous tree was unavailing.

2. The trial court did not violate the defendant's right to a fair trial or to
   the assistance of counsel by compelling the defendant to disclose to
   the state prior to trial the substance of the opinions of his expert witness;
   contrary to the defendant's claim, the court's action did not implicate

his right to the assistance of counsel, the court did not preclude the testimony of the defendant's expert, nor did it order the defendant to make written disclosures, even though it was authorized to do so under the applicable rule of practice (§ 40-27), the court acted within its broad discretion to maintain the orderly procedure of the proceeding by ordering the defendant's expert to appear to make an offer of proof regarding the substance of the expert's opinions to obviate the need, in the middle of trial, for the state to request a continuance to prepare for cross-examination, and the issue thereafter resolved itself when the defendant voluntarily supplied the state with the expert's written report.

Argued October 18, 2017—officially released January 23, 2018

*Procedural History*

Substitute information charging the defendant with the crime of arson in the first degree, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *White, J.*, denied the defendant's motions to suppress certain evidence; thereafter, the matter was tried to the jury; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Stephan E. Seeger*, with whom, on the brief, was *Igor G. Kuperman*, for the appellant (defendant).

*Linda F. Currie-Zeffiro*, assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Paul J. Ferencek*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Anthony C. Manousos, appeals from the judgment of conviction, rendered after a jury trial, of arson in the first degree in violation of General Statutes § 53a-111 (a) (1). The defendant claims that the trial court improperly (1) denied his motions to suppress various tangible items collected from him, as well as oral statements that he made to the police during an investigatory stop and subsequent patdown search for weapons; and (2) compelled him to disclose prior to trial the substance of the opinions of the expert witness he intended to call at trial. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts on the basis of the evidence adduced at trial. On December 3, 2014, at approximately 12:40 p.m., the Stamford police received a 911 call from Brenda Ortiz. Ortiz reported that the multifamily home located at 52 Highland Road, in which she rented the first floor apartment, was on fire. The property was owned by the defendant and was in need of substantial repairs. The defendant had been unable to sell the house despite repeated efforts to find a buyer.

On that day, Ortiz had been asleep on the couch in her living room when she was awakened by a strong smell of gasoline. Unsure of where the smell was coming from, Ortiz headed toward the porch. The smell became even stronger as she walked into the foyer, so she propped open the foyer door to ventilate the area with fresh air.

Ortiz then went back inside her apartment to call her husband. Once inside, she heard the foyer door slam shut, as well as footsteps on the stairs leading to the second and third floor apartment units. Ortiz went back into the foyer, where she saw "two legs and a pair of boots" traversing up the stairs. She yelled out to the defendant,[1] who did not stop or respond. Although Ortiz could not see the defendant's face, she noticed that the person was wearing jeans and black boots.

Ortiz went back inside her apartment and dialed 911. As she was dialing, she heard a loud explosion. Ortiz looked back into the foyer and saw a "fireball" coming out of the stairwell. She also saw the defendant running down the stairs wearing the same jeans and boots she had observed just moments beforehand, as well as a black hooded sweatshirt.

Ortiz then grabbed her car keys and ran outside, where she saw the defendant walking quickly down the sidewalk. She chased after him, yelling, "yo, what the fuck you just did?" The defendant turned back, saw Ortiz, and took off running toward Grove Street.

Ortiz then got into her truck and attempted to track him down. Unable to locate him, Ortiz drove back to

52 Highland Road and parked on the street. She then provided a description of the defendant to the 911 operator. Soon after, police and fire personnel arrived.

Meanwhile, Sergeant Russell Gladwin of the Stamford Police Department was patrolling in his vehicle on Grove Street when he received a dispatch reporting a fire at 52 Highland Road. The dispatcher reported that the man suspected of starting the fire had taken off down Highland Road and was headed toward Grove Street.

Gladwin responded to the call, as he was only a short distance away. As Gladwin turned right from Grove Street onto Highland Road, he encountered the defendant coming out of an empty grassy lot to his left. Gladwin stopped the defendant and asked where he was coming from. The defendant spontaneously offered to show Gladwin his driver's license.

Officer Jonathan Rizzitello arrived in the area shortly after Gladwin. As Rizzitello approached, Gladwin gestured to him to handcuff the defendant. Rizzitello then conducted a patdown search for weapons, and seized the defendant's hooded sweatshirt and umbrella, which he was carrying, as well as two sets of keys and a box of wooden matches found in the defendant's jeans pocket.[2]

Edward Rondano, a Stamford police officer assigned to the department's crime scene unit, also reported to the residence located at 52 Highland Road. A fire marshal pointed out to Rondano that there were two used matches on the floor in front of the stairway. Rondano collected the matches and stored them in plastic bags.

At about 2:15 p.m., an arson investigator, Detective Paul Makuc of the state police, arrived at the residence. Upon entering the foyer, Makuc smelled gasoline. Makuc also saw an irregular burn pattern on the carpet covering the foyer stairwell. Specifically, Makuc noticed that the carpet on the top of the stairs was intact, although portions of the carpet on the lower half of the stairs had been destroyed by fire.

Makuc believed that the irregular burn pattern indicated that an accelerant may have been poured on the staircase, suggesting arson. He therefore decided to secure the scene and apply for a warrant to search the residence, as well as the defendant's clothing and his girlfriend's white Mercedes, which was found parked a short distance down the street.

After the warrants were issued, Makuc and his team reconvened and began their investigation. The team concluded that the basement, attic unit, and second floor units did not incur any interior fire damage, while on the first floor the foyer stairwell and closet directly beneath it were severely damaged.

A trained canine aided Makuc in detecting the possible origin of the fire. In the stairwell, the canine alerted

to both ends of the irregular burn pattern, indicating the presence of an accelerant such as gasoline. The canine did not alert to any other areas in the home, including the closet underneath the foyer stairwell. After completing their investigation of the residence, Makuc and his team members concluded that the fire originated in the foyer stairwell and was incendiary in nature—meaning that it was "set by human hands with the use of an ignitable liquid in conjunction with an ignition source consistent with an open flame . . . [such as] a match or a lighter."

Makuc and his team then returned to the Stamford police station, where they executed search warrants for the defendant's clothing items and his girlfriend's vehicle. Makuc's canine alerted to the defendant's black hooded sweatshirt, as well as to one of his boots. Makuc then searched the pockets of the sweatshirt and found two partially burnt wooden matches, a white cotton mask, and two cotton gloves. Forensic testing later confirmed the presence of gasoline on the gloves, boot, and hooded sweatshirt.

In the trunk of the vehicle belonging to the defendant's girlfriend, Makuc found a white garbage bag containing a red, plastic five gallon gasoline can, as well as metal containers filled with Coleman fuel. Makuc also found an opened five-pack of white masks containing four of the five masks. Forensic testing later confirmed that the fibers from the masks found in the trunk were consistent with white fibers found in the defendant's beard.

In the front console of the vehicle, the investigators found a receipt from Home Depot for a purchase dated December 3, 2014—the same day of the fire—for a five gallon plastic gasoline container. In addition, a pressure sprayer was found in the backseat of the vehicle. Forensic testing later confirmed the presence of gasoline in both the five gallon plastic container and the pressure sprayer.

The defendant was subsequently arrested and, following a jury trial, convicted of arson in the first degree in violation of § 53a-111 (a) (1). He was sentenced to fourteen years of incarceration, followed by eleven years of special parole. This appeal followed.

I

The defendant first claims that the trial court improperly denied his motion to suppress the tangible items collected from his person, and oral statements that he made to the police following the investigatory stop and subsequent patdown for weapons conducted by officers Gladwin and Rizzitello. Specifically, the defendant argues that the police lacked a reasonable and articulable suspicion to stop him, as well as a reasonable belief that he may have been armed and dangerous. We disagree.

The following additional facts, which the trial court found following an evidentiary hearing, and procedural history are relevant to this claim. On December 3, 2014, at approximately 12:40 p.m., Gladwin responded to a radio dispatch about a fire at 52 Highland Road. The dispatcher reported that the woman who called 911 had seen a Hispanic male wearing a gray sweater fleeing the scene.

Gladwin, who was driving down Grove Street a short distance away, responded to the call. He reached Highland Road within twenty seconds of receiving the dispatch. Upon turning onto Highland Road, Gladwin saw the defendant walking out of an empty grassy lot about 300 feet from the fire. Although it was forty degrees and raining that day, the defendant was wearing only jeans and a T-shirt. The defendant was also carrying an umbrella and something that looked to Gladwin to be an outer garment.

Gladwin rolled down his window and asked the defendant where he was coming from. The defendant gestured back toward the empty lot and stated "over there." The defendant then spontaneously offered to show Gladwin his driver's license, which listed a Norwalk address. Gladwin noticed that the defendant was out of breath, perspiring, and had a "deer in headlights" look.

Shortly after Gladwin encountered the defendant, Rizzitello arrived at the scene. At that point, Gladwin believed that detaining the defendant was appropriate. Gladwin therefore gestured to Rizzitello to handcuff the defendant.

As he was approaching the defendant, Rizzitello noticed a bulge in his front left pocket. Rizzitello then performed a patdown on the outside of the defendant's clothing for weapons. In doing so, he felt something "sharp and hard" in the defendant's front left pocket. Rizzitello then searched the contents of that pocket and found two sets of keys and a box of wooden matches.

Rizzitello informed Gladwin of what he found. Gladwin instructed him to secure the items, as well as the defendant's umbrella and black hooded sweatshirt. Gladwin also instructed Rizzitello to detain the defendant in anticipation of a potential street showup identification procedure.

As Rizzitello was escorting the defendant to his vehicle, the defendant spontaneously asked, "What's going on?" Rizzitello told the defendant that the police had received a report of a fire at 52 Highland Road, and that a man suspected of possibly starting the fire was seen fleeing down that street. Without being asked or otherwise prompted, the defendant stated that he owned that residence, his girlfriend had dropped him off there to collect rent from his tenants, he knocked on the door and nobody was home, and that he then

began walking to meet his girlfriend at a mall.

A short while later, Officer Sean Boeger of the Stamford Police Department's major crimes unit asked Rizzitello to show him the items taken from the defendant. Boeger noticed that the defendant's black hooded sweatshirt smelled heavily of gasoline, and that the wooden matches that the defendant was carrying in his pocket were similar to the ones found on the floor of the foyer at the residence.

Boeger then decided to question the defendant. After Boeger properly apprised the defendant of his $Miranda^3$ rights, the defendant voluntarily waived his rights and agreed to talk to Boeger. In response to Boeger's questions, the defendant made a number of statements, including that (1) his girlfriend had dropped him off at the corner of Highland Road and Grove Street; (2) he was not wearing his jacket that day because he "ran hot"; (3) he had been walking in the empty grassy lot to see how the "leaves were being piled up on the lot"; (4) his hooded sweatshirt smelled like gasoline because he had been using a leaf blower; and (5) he was carrying the box of matches because they had sentimental value to him.

Furthermore, when Boeger asked the defendant why the wooden matches in his pocket appeared to match those found in the foyer of the residence, he told Boeger to question Ortiz, who, he claimed, owed him $3000 in unpaid rent and whom he had seen "speeding out of the driveway" earlier that day. When Boeger told the defendant that he thought the defendant had set the fire, the defendant accused Boeger of trying to get him to admit to something that he would not.

The defendant filed a motion to suppress the tangible items collected from his person, as well as his girlfriend's vehicle, following his arrest. He also later filed a second motion to suppress oral statements that he made to various officers the day of his arrest.

On February 22, 2016, the trial court, *White, J.*, issued a memorandum of decision addressing both of the defendant's motions to suppress. The court concluded that, on the basis of the totality of the circumstances, the police had a reasonable and articulable suspicion to conduct an investigatory stop and subsequent patdown of the defendant. Specifically, the court found persuasive that (1) Gladwin responded to the dispatch and, within twenty seconds, encountered the defendant approximately 300 feet from the fire; (2) the defendant was carrying a sweatshirt in accordance with the description of the possible suspect relayed in the dispatch; (3) the defendant was winded and wearing only a T-shirt even though it was cold and damp that day; and (4) the defendant was the only person on foot in the immediate area.

Furthermore, the court determined that the police

had a reasonable belief that the defendant may have been armed and dangerous considering the serious nature of the crime. The court also concluded that the police were entitled to search the contents of the defendant's front left pocket after feeling something "sharp and hard" during the patdown of the outside of his clothes. The court therefore denied the defendant's motions, and the tangible items seized from the defendant, as well as his statements, were later admitted as evidence at trial.

We begin by setting forth the relevant standard of review. "[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct . . . ." (Internal quotation marks omitted.) *State* v. *Saturno*, 322 Conn. 80, 87-88, 139 A.3d 629 (2016).

In evaluating the constitutionality of a search and seizure, however, the court must "undertake a more probing factual review . . . ." (Internal quotation marks omitted.) *State* v. *Edmonds*, 323 Conn. 34, 39, 145 A.3d 861 (2016). Thus, "[a]lthough we must, of course, defer to the trial court's factual findings, our usual deference . . . is qualified by the necessity for a scrupulous examination of the record to ascertain whether [each] finding is supported by substantial evidence . . . ." (Internal quotation marks omitted.) Id.

A

The defendant argues that Gladwin lacked the requisite reasonable and articulable suspicion that the defendant was involved in criminal activity in order to make a lawful investigatory stop. The defendant maintains that he was stopped "based on (1) his location near the crime scene, (2) the fact that he was the only male on the street in an otherwise wholly residential area during daytime hours, (3) his choice of attire, and (4) . . . his initial surprised reaction to being stopped by . . . Gladwin," and that such facts did not justify the investigatory stop. We disagree.

"Under the fourth amendment to the United States constitution, and under article first, § 7, and article first, § 9, of the Connecticut constitution,[4] a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime." (Footnotes added and omitted.) *State* v. *Trine*, 236 Conn. 216, 223, 673 A.2d 1098 (1996). "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person,

having the information available and known by the police, would have had that level of suspicion." (Internal quotation marks omitted.) *State* v. *Nash*, 278 Conn. 620, 633, 899 A.2d 1 (2006). "Courts have used a variety of terms to capture the elusive concept of [reasonable and articulable suspicion]. . . . But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account." (Internal quotation marks omitted.) Id.

The totality of the circumstances supports a finding of reasonable and articulable suspicion. It is well established that "[p]roximity in time and place of the stop to the crime is highly significant in the determination of whether an investigatory detention is justified by reasonable and articulable suspicion." (Internal quotation marks omitted.) *State* v. *Houghtaling*, 155 Conn. App. 794, 813, 111 A.3d 931 (2015), aff'd, 326 Conn. 330, 163 A.3d 563 (2017). The court found that it took Gladwin no longer than twenty seconds to reach Highland Road after receiving the dispatch, and that the defendant was stopped 300 feet from the residence. See *Navarette* v. *California*, U.S. , 134 S. Ct. 1683, 1689, 188 L. Ed. 2d 680 (2014) (reasonable suspicion existed to stop suspected drunken driver eighteen minutes after 911 caller reported his location, which was roughly nineteen highway miles south of where he was stopped; "[t]hat sort of contemporaneous report has long been treated as especially reliable"); see also *United States* v. *Jackson*, 652 F.2d 244, 248 (2d Cir.) (reasonable suspicion existed to stop suspect whose vehicle was coming from direction in which robber had fled on foot less than five minutes earlier), cert. denied, 454 U.S. 1057, 102 S. Ct. 605, 70 L. Ed. 2d 594 (1981); *State* v. *Kyles*, 221 Conn. 643, 661, 607 A.2d 355 (1992) (reasonable suspicion existed to stop suspect sighted less than two miles from crime scene ten minutes after commission of crime). Indeed, the fact that the defendant was stopped in particularly close proximity in time and space to the residence and the fire strongly supports a finding of reasonable suspicion.

Furthermore, the defendant was the only person on foot in the area. Gladwin testified that, "based on the call we had, and the fact that there was *no one else on that street*, [he] thought it was strange that there was someone right there in close proximity to [the fire]." (Emphasis added.) This fact further supports a finding of reasonable suspicion. See *United States* v. *McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) (reasonable suspicion existed to stop suspect, who was walking alone with no other pedestrians about, approximately 200 feet west of crime scene just minutes after reported burglary attempt), cert. denied, 552 U.S. 1042, 128 S. Ct. 645, 169 L. Ed. 2d 515 (2007).

Moreover, the defendant had a "classic deer in headlights" look on his face when he saw Gladwin. This court

has previously held that "the reaction of the suspect to the approach of police" is yet another factor that may support a finding of reasonable suspicion. (Internal quotation marks omitted.) *State* v. *Houghtaling*, supra, 155 Conn. App. 813. In particular, "nervous . . . behavior is a pertinent factor in determining reasonable suspicion." *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). The defendant's apparent surprise at seeing a police officer therefore heightened Gladwin's reasonable suspicion that the defendant was involved in the arson.

Finally, Gladwin's observations that the defendant was wearing only jeans and a T-shirt, despite the chilly and rainy weather, and was breathing heavily and perspiring supported Gladwin's reasonable suspicion that the defendant was running from the arson scene, as the police dispatcher had reported. See *State* v. *Braxton*, 196 Conn. 685, 691–92, 495 A.2d 273 (1985) (fact that suspect, who was discovered near crime scene within minutes of commission of crime, was perspiring and breathing heavily supported inference that he had been running to avoid apprehension); see also *State* v. *Wilson*, 178 Conn. 427, 430, 436, 423 A.2d 72 (1979) (officer had reasonable grounds to arrest two suspects who had reportedly fled on foot and were sweating and breathing heavily when apprehended on cold November night two miles from attempted robbery); *State* v. *Miller*, 137 Conn. App. 520, 539–40, 48 A.3d 748 (reasonable suspicion existed to stop suspect who was sweating profusely and who was in close temporal and physical proximity to scene of burglary), cert. denied, 307 Conn. 914, 54 A.3d 179 (2012).

The defendant also argues that Gladwin lacked the "requisite particularity of description" to stop the defendant because the color of his sweatshirt, as well as his ethnicity, did not match the description of the suspect relayed by the dispatcher. Specifically, the dispatcher described the suspect as a Hispanic male wearing a gray sweater, while the defendant is a Caucasian male who was carrying a black hooded sweatshirt.

Our Supreme Court, however, has held that "[t]he police . . . are not required to confirm every description of the perpetrator that is broadcast over the radio. What must be taken into account is the strength of those points of comparison which do match up and whether the nature of the descriptive factors which do not match is such that an error as to them is not improbable . . . ." (Internal quotation marks omitted.) *State* v. *Kyles*, supra, 221 Conn. 663. As the trial court correctly noted, "the defendant's race, ethnicity and the color of the garment he was carrying were relatively unimportant [factors] in comparison to the fact that he was a male, he was carrying an outer garment which could have been a sweater or a sweatshirt, he was the only person on the street and he was a short distance

from the scene of the fire at the time Gladwin saw him." See *State* v. *Gregory*, 74 Conn. App. 248, 258–60, 812 A.2d 102 (2002) (reasonable suspicion existed even though defendant was described by officer to dispatch as having short hair and wearing gray pants, black sneakers, gray jacket, and black hooded sweatshirt, while defendant, whose hair was tightly braided in corn-rows, was wearing jeans, brown boots, and black hooded sweatshirt when stopped; description provided was sufficiently similar taken together with additional facts that supported reasonable suspicion), cert. denied, 262 Conn. 948, 817 A.2d 108 (2003). Accordingly, we conclude that the court properly determined that, under the totality of the circumstances, the investigatory stop was justified by a reasonable and articulable suspicion.

B

The defendant next argues that the police lacked the requisite reasonable belief that the defendant may have been armed and dangerous to justify a patdown for weapons. The defendant asserts that besides the serious nature of the crime, there was "absolutely nothing in the record that could explain why the police officers thought that the defendant posed a threat to their safety . . . ." We disagree.

"If, during the course of a lawful investigatory detention, the officer reasonably believes that the detained individual might be armed and dangerous, the officer may undertake a patdown search of the individual to discover weapons." *State* v. *Trine*, supra, 236 Conn. 223–34. "In the case of the self-protective search for weapons, [the officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. . . . The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that [the officer's] safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given . . . to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of [the officer's] experience." (Citation omitted; internal quotation marks omitted.) *State* v. *Nash*, supra, 278 Conn. 631–32.

Again, the totality of the circumstances supports a finding that the officers reasonably believed that the defendant may have been armed and dangerous. Before the patdown, Rizzitello observed a bulge in the defendant's front left pocket, indicating that he may have been carrying a weapon. This fact alone constitutes strong justification for a patdown. See *Pennsylvania* v. *Mimms*, 434 U.S. 106, 112, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (bulge in defendant's jacket "permitted the officer to conclude that [the defendant] was armed and

thus posed a serious and present danger"); see also *United States* v. *Hamilton*, 978 F.2d 783, 785 (2d Cir. 1992) (patdown was justified after officer observed unidentifiable bulge in defendant's pants).

Additionally, the officers had reason to suspect the defendant of committing a serious crime—namely, setting a house on fire while someone was inside—in broad daylight, and then fleeing the scene. These facts support the officers' reasonable belief that they may have been dealing with an armed and dangerous felon. See *United States* v. *Edwards*, 53 F.3d 616, 618 (3d Cir. 1995) (patdown of individual suspected of credit card fraud was reasonable because crime occurred "in broad daylight," which could "lead [the officer] to believe that the perpetrators might have armed themselves to facilitate their escape if confronted").

The defendant further argues that the patdown was illegal because the defendant was cooperative and already handcuffed by Rizzitello prior to being patted down. Our Supreme Court, however, as well as federal courts, have held that a handcuffed suspect may still present a danger to the police. See *United States* v. *Wallen*, 388 F.3d 161, 166 (5th Cir. 2004), (rejecting argument that suspect in handcuffs does not present danger to police), cert. denied, 544 U.S. 967, 125 S. Ct. 1747, 161 L. Ed. 2d 613 (2005); see also *State* v. *Nash*, supra, 278 Conn. 645–48 (patdown conducted in lobby of police station while defendant was handcuffed was valid). Thus, the fact that the defendant was handcuffed during the patdown does not automatically render it unlawful.

Likewise, the defendant's cooperation did not undermine the legality of the patdown. Certainly, a suspect's refusal to cooperate, as well as hostile, evasive behavior, may further support an officer's belief that a suspect is armed and dangerous. See *State* v. *Mann*, 271 Conn. 300, 324, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005). That does not mean, however, that the inverse is necessarily true— that a suspect's cooperation eliminates the officer's belief that the suspect is armed and dangerous. In the present case, there were other facts present that justified the patdown, such as the fact that Rizzitello observed a bulge in the defendant's pocket, and the serious and possibly violent nature of the crime. We therefore conclude that the limited patdown of the defendant for weapons was proper.

### C

Having determined that the investigatory stop and subsequent patdown of the defendant were proper, we conclude that the seizure of the matchbox found in the defendant's front left pocket, as well as the defendant's sweatshirt and umbrella, was also warranted. It is well established that "[t]he results of the initial [investiga-

tory] stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." (Internal quotation marks omitted.) *State* v. *DelValle*, 109 Conn. App. 143, 155, 950 A.2d 603, cert. denied, 289 Conn. 928, 958 A.2d 160 (2008). Therefore, as the trial court correctly noted, it was reasonable for the police to enlarge the scope of the search by detaining the defendant for a showup identification and seizing the items he was carrying after discovering that he was in possession of matches and had just come from 52 Highland Road, the location of a suspected arson.

Finally, because we conclude that the officers lawfully conducted an investigatory stop and patdown, the defendant's claim that his subsequent statements should not have been admitted because they constitute the "fruit of the poisonous tree" necessarily fails. To the extent that the defendant argued to the trial court that the statements were also inadmissible because they resulted from an unlawful custodial interrogation, he has not advanced that claim on appeal.

II

The defendant next claims that the trial court violated his right to a fair trial and to the assistance of counsel by compelling him to disclose, prior to trial, the opinions of his expert witness. We disagree.

The following additional facts are relevant to the resolution of the defendant's claim. On October 8, 2015, the state filed a discovery motion invoking Practice Book §§ 40-26[5] and 40-27[6] in which it requested that the defendant disclose in writing "any reports or statements of experts made in connection with the case" as well as any other "relevant material and information not covered by Practice Book [§] 40-26 which the judicial authority determines [on] good cause should be made available."

In response to the state's motion, the defendant filed a disclosure identifying Michael K. Higgins, Sr., as his expert witness. The defendant's disclosure also stated the various topics to which Higgins would testify, including the origin and cause of the fire, burn pattern recognition, and flammability of the materials involved, among other topics. The disclosure, however, did not provide any substantive information beyond the list of topics.

On January 8, 2016, the state filed a motion in limine to preclude Higgins from testifying until the sum and substance of his testimony was disclosed to the state. In its motion, the state posed six questions in response to the topics listed by the defendant, such as whether

Higgins disagreed with the state investigators that the fire was incendiary in nature, and Higgins' opinion as to the origin and cause of the fire. The defendant did not respond.

On January 12, 2016, the court first addressed the state's motion in limine. The state argued that it was entitled to have "some idea of what . . . particularly the person is going to be testifying to . . . ." The defense responded that it was not required to provide an expert report because Higgins had not written one.

The court postponed deciding the state's motion in the hope that the parties would resolve the dispute without its intervention. The court advised the parties that if they had not come to an agreement by January 14, 2016, then it would set a date for Higgins to appear in court to disclose the sum and substance of his testimony regarding the cause and origin of the fire. On January 13, 2016, the court again addressed the state's motion, during which it repeated its warning that "if you don't [come to an agreement], then either Friday of this week or Tuesday of next week . . . your expert should be here and we'll have a hearing outside the presence of the jury, and we'll take it from there."

On January 14, 2016, the parties told the court that the defense had agreed to file a written response to the state's motion, including answers to the six questions posed therein. On January 15, 2016, the state reported that the defendant's response to its motion in limine failed to provide any substantive information regarding Higgins' testimony. The defense responded that it was "unprecedented in a criminal case that [the defense was] being required to answer interrogatories," and that it was not required to reveal its strategy to the state or provide "insight into the defense mind . . . ."

The state responded that the questions in its motion in limine were not interrogatories, but rather necessary follow-up questions to the initial skeletal disclosure by the defense. The state further responded that it simply needed to have some understanding of the substance of Higgins' testimony so that it could avoid needing to request a lengthy continuance in the middle of the trial. The court then ordered Higgins to appear on January 19, 2016, so the defense could make an offer of proof regarding his testimony.

Higgins, however, did not appear in court as ordered. Rather, the defendant filed a supplemental disclosure on that date, which included very brief responses to each of the six questions posed in the state's motion in limine. The court advised the defendant that because he failed to provide the "sum and substance of what [Higgins] was going to testify about on various points," it was going to "consider either preventing [Higgins] from testifying at all or limiting his testimony." The court did not at any point, however, order Higgins to

generate an expert report.

The next day, the defense unexpectedly provided the state with a report prepared by Higgins containing his opinion as to the cause and origin of the fire. Higgins was subsequently qualified as an expert witness and testified for the defense during its case-in-chief.

The defendant argues that the court's actions "coerced the defendant's disclosure of information regarding the anticipated testimony of his expert witness well in excess of what the rules of practice require him to produce." The defendant further argues that the court left him no choice but to direct Higgins to draft a report for the "benefit of the state." We disagree.

We first turn to ascertaining the appropriate standard of review for this claim. The defendant asserts that the court impaired his ability to present a defense and compelled him to disclose his trial strategy prematurely, which diluted his right to the assistance of counsel. Accordingly, the defendant contends, we should exercise plenary review of his claim because it is of constitutional magnitude. For the following reasons, we disagree that the court's actions in compelling the defendant to disclose prior to trial the substance of the opinions of his expert witness implicated his constitutional rights and conclude that the defendant is simply attempting to clothe a nonconstitutional claim in constitutional garb. See, e.g., *State* v. *Romero*, 269 Conn. 481, 505, 849 A.2d 760 (2004).

First, the defendant concedes, as he must, that Higgins' testimony was not limited or precluded in any way and that he was "ultimately allowed to present his defense in full with the aid of his expert's testimony." Instead, the defendant argues, in essence, that he has a constitutional right to present expert testimony without first disclosing to the state *any* of the substance of his expert's opinion.

The defendant cites no authority—nor could we find any—that supports his assertion. In fact, the few cases the defendant does rely on only serve to reinforce our conclusion that the court's order in no way implicated the defendant's constitutional rights. With respect to his argument that the court's actions intruded on his constitutional right to present a defense, the defendant cites cases that discuss the court's exclusion of certain evidence at trial. See, e.g., *State* v. *West*, 274 Conn. 605, 622, 626–27, 877 A.2d 787 (trial court's ruling that unidentifiable fingerprints were inadmissible did not violate defendant's constitutional right to present defense), cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005); *State* v. *Cerreta*, 260 Conn. 251, 259–63, 796 A.2d 1176 (2002) (trial court's exclusion of exculpatory hair and fingerprint evidence violated the defendant's constitutional right to present defense); *State* v. *Carter*, 228 Conn. 412, 416–17, 426–27, 636 A.2d

821 (1994) (trial court's exclusion of victim's criminal record that supported defendant's claim of self-defense violated defendant's constitutional right to present defense). As we have noted repeatedly, however, Higgins' testimony was not precluded, nor limited, in any way, and the defendant himself concedes that he was able to present his defense in full. "A defendant may not successfully prevail on a claim of a violation of his right to present a defense . . . if [the defendant] adequately has been permitted to present the defense by different means." *State* v. *Santana*, 313 Conn. 461, 470, 97 A.3d 963 (2014). Therefore, his argument fails.

With respect to his assertion that the trial court infringed on his sixth amendment right to the assistance of counsel, the defendant relies heavily on *State* v. *Lenarz*, 301 Conn. 417, 22 A.3d 536 (2011). In that case, the state obtained and reviewed extensive privileged communications between the defendant and his attorneys outlining the defense trial strategy, including how the defense planned to undermine the complaining witness' credibility. Id., 421, 444–46. The state then used those privileged communications to "anticipate and thereby neutralize" potential weaknesses in the complainant's testimony and avoid "what otherwise might have been a devastating cross-examination of that witness." Id., 446.

In the present case, unlike in *Lenarz*, the state did not obtain any privileged material. The defendant himself acknowledges this. Moreover, the defendant cites no case law that suggests that, absent facts similar to those in *Lenarz*, disclosure of an expert witness' opinion prior to trial violates the defendant's right to assistance of counsel.

Our appellate courts have repeatedly held that "[t]he sixth amendment does not confer the right to present testimony free from the legitimate demands of the adversary system. . . . The adversary system of trial is hardly an end in itself; it is not . . . a poker game in which players enjoy an absolute right always to conceal their cards until played. We find ample room in that system [for a rule that] is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence." (Citation omitted; internal quotation marks omitted.) *State* v. *Boucino*, 199 Conn. 207, 213, 506 A.2d 125 (1986). Accordingly, we conclude that the court's actions did not implicate the defendant's right to the assistance of counsel and that plenary review is not appropriate.

Instead, we emphasize that "[t]he purpose of criminal discovery is to prevent surprise and to afford the parties a reasonable opportunity to prepare for trial." (Internal quotation marks omitted.) *State* v. *Wilson F.*, 77 Conn. App. 405, 419, 823 A.2d 406, cert. denied, 265 Conn. 905,

831 A.2d 254 (2003). To that end, "[t]he trial court has broad discretion in applying sanctions for failure to comply with discovery orders." (Internal quotation marks omitted.) *State* v. *Colon*, 71 Conn. App. 217, 241, 800 A.2d 1268, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002); Practice Book § 40-5. We review the court's actions in managing discovery pursuant to the abuse of discretion standard. *State* v. *Colon*, supra, 241–42.

Moreover, if the defendant has properly characterized his claim as one concerning the admissibility of expert witness testimony, "[w]e [also] review a trial court's decision [regarding the admission of] expert testimony for an abuse of discretion. . . . We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision." (Internal quotation marks omitted.) *State* v. *Edwards*, 325 Conn. 97, 123, 156 A.3d 506 (2017).

We turn then to the ultimate question of whether the trial court abused its discretion in compelling the defendant to disclose prior to trial the substance of the opinions of his expert witness. We conclude that it did not.

The state's discovery motion invoked Practice Book §§ 40-26 and 40-27. Practice Book § 40-27 expressly authorizes the court to "direct the defendant to disclose *in writing* to the prosecuting authority . . . relevant material and information . . . which the judicial authority determines on good cause shown should be made available." (Emphasis added.) Therefore, even if the court had ordered the defendant to disclose in writing the expert opinions that he intended to offer through the testimony of Higgins, the court would have been authorized in doing so.

The court, however, never actually ordered the defendant to make any written disclosures. Indeed, the record shows that the court would have preferred that it not get involved in the discovery dispute at all. The court repeatedly instructed the defendant and the state to resolve the issue without court interference. It was only after it became apparent as a result of the defendant's continued incremental and incomplete disclosures that the parties would not be able to resolve the dispute that the court ordered Higgins to appear to make an offer of proof outside the presence of the jury. Moreover, after the defendant voluntarily supplied Higgins' report, the court did not have to conduct the offer of proof or make a finding of good cause. Thus, the issue resolved itself.

The defendant relies on *State* v. *Genotti*, 220 Conn. 796, 601 A.2d 1013 (1992), for the proposition that Practice Book § 40-26—which contains the language pre-

viously set forth in former Practice Book § 769, the provision at issue in that case—does not require a defendant's expert witness to prepare a report or statement in anticipation of trial. Id., 808–809. In *Genotti*, our Supreme Court held that the trial court improperly excluded the testimony of the defendant's expert witness after the witness failed, pursuant to court orders, to create a report summarizing the results of various tests he had conducted in preparation for trial. Id., 803, 808–809.

The defendant is correct that Practice Book § 40-26, like former § 769, does not require an expert to generate a report if he or she has not already done so. In the present case, however, the state also invoked § 40-27, which, unlike § 40-26, does in fact authorize a court to order a defense expert to provide certain information, in writing, to the state. More importantly, in the present case, the court neither (1) ordered Higgins to generate a report, nor (2) precluded Higgins' testimony. Thus, *Genotti* is not controlling here.

In sum, it is well established that the court has "broad, general authority to act to maintain the orderly procedure of the [proceeding], and to prevent any interference with the fair administration of justice." (Internal quotation marks omitted.) *Carmon* v. *Commissioner of Correction*, 148 Conn. App. 780, 786, 87 A.3d 595 (2014). The court was therefore authorized in ordering Higgins to appear to make an offer of proof to obviate the need, in the middle of trial, for the state to request a continuance in order to prepare its cross-examination, recall its own expert to testify regarding the opinions offered by Higgins, and/or request a *Porter*[7] hearing. We are unpersuaded that the court abused its discretion in any manner.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Ortiz initially did not know that this person was the defendant, her landlord. Shortly after the police had taken the defendant into custody, however, she identified the defendant at a street showup identification procedure as the same person who had run from 52 Highland Road. At trial, she identified the defendant as her landlord.

[2] Additional facts regarding the investigatory stop and subsequent patdown will be set forth in part I of this opinion.

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] We note that our appellate courts "repeatedly [have] observed that the language of article first, § 7, of the state constitution closely resembles the language of the fourth amendment to the federal constitution. . . . In light of this textual similarity, it is not surprising that . . . we consistently have recognized that, in determining whether article first, § 7, has been violated, we employ the same analytical framework that would be used under the federal constitution." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Kelly*, 313 Conn. 1, 15, 95 A.3d 1081 (2014).

[5] Practice Book § 40-26 provides in relevant part that "[u]pon written request by the prosecuting authority . . . the defendant . . . shall . . . disclose in writing to the prosecuting authority the existence of and make available for examination . . . the following items . . .

"(2) [a]ny reports or statements of experts made in connection with the case, including results of physical or mental examinations and of scientific tests, experiments or comparisons, which the defendant intends to offer in

evidence at trial or relating to the anticipated testimony of a person whom the defendant intends to call as a witness."

[6] Practice Book § 40-27 provides in relevant part that "[u]pon written request by a prosecuting authority . . . the judicial authority may direct the defendant to disclose in writing . . . any other relevant material and information not covered by Section 40-26 which the judicial authority determines on good cause shown should be made available."

[7] See *State* v. *Porter*, 241 Conn. 57, 80–90, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

———————————————