******************************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.

******************************************************

Bright, C. J., and Elgo and Clark, Js.

*Syllabus*

The defendant, who had been convicted of two counts of the crime of possession of narcotics with intent to sell, appealed to this court, claiming that the trial court improperly denied his motions for a mistrial and his motion to suppress evidence, including, inter alia, 121 bags of individually packaged crack cocaine, that was seized from his residence pursuant to a search warrant. At trial, the state offered the expert testimony of a police detective, P, who testified about the quantities of drugs usually found in the possession of people who sell drugs as opposed to people who only use drugs. Answering a hypothetical posed by the prosecutor, P testified that the possession of 121 bags of crack cocaine was consistent with someone who sold drugs. Following argument that this testimony went to the ultimate issue of the defendant's intent, the court denied defense counsel's motion for a mistrial. The state also offered the testimony of Y, a police sergeant, who testified that he knew where the defendant lived "from other situations" that involved the defendant. Defense counsel argued that Y's testimony improperly informed the jury that the defendant had prior involvement with the police but did not request a limiting or curative instruction following the court's denial of a motion for a mistrial. The defendant also argued that the search warrant for his apartment, the application for which had been based on the affidavit of P and another police detective, L, referencing in part two sales of narcotics by the defendant to a confidential informant, had been issued without probable cause. *Held*:

1. The trial court did not abuse its discretion in denying the defendant's motions for a mistrial.

   a. The trial court did not abuse its discretion in denying the defendant's motion for a mistrial after P's testimony, as P's response to the state's hypothetical questions did not amount to an opinion as to the ultimate issue of the defendant's intent to sell narcotics; pursuant to the opinion of our Supreme Court in *State* v. *Nash* (278 Conn. 620), the significance of the quantity of narcotics found on a suspect is a proper subject of expert testimony, and P's testimony concerned a hypothetical individual and not this defendant.

   b. The defendant could not prevail on his claim that the trial court abused its discretion in denying his motion for a mistrial based on Y's testimony; Y's statement mentioning "other situations" was vague and did not mention prior misconduct, police investigations or anything nefarious, and defense counsel, who specifically told the court that he did not want a curative instruction, could not opt for a mistrial instead.

2. The trial court properly denied the defendant's motion to suppress evidence, as probable cause existed to support the issuance of the search warrant for the defendant's apartment; P and L attested that they had heard multiple reports that the defendant had been selling narcotics out of his apartment, a confidential informant made two controlled purchases of narcotics from the defendant under police observation, and a reasonable inference could be made that the defendant brought narcotics from his apartment when he met with the confidential informant.

Argued April 5—officially released August 3, 2021

*Procedural History*

Substitute information charging the defendant with two counts of the crime of possession of narcotics with intent to sell, brought to the Superior Court in the judicial district of Middlesex, geographical area number nine, where the court, *Suarez, J.*, denied the defendant's

motion to suppress certain evidence; thereafter, the matter was tried to the jury before *Suarez, J.*; subsequently, the court denied the defendant's motions for a mistrial; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Freeman J. Demirjian*, certified legal intern, with whom was *James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Brett R. Aiello*, deputy assistant state's attorney, with whom, on the brief, were *Michael A. Gailor*, state's attorney, *Kevin M. Shay*, senior assistant state's attorney, and *Jacqueline M. Fitzgerald*, special deputy assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, C. J. The defendant, Jiquane Chris Collins, appeals from the judgment of conviction, rendered by the trial court in accordance with the jury's verdict, of two counts of possession of narcotics with intent to sell in violation of General Statutes (Rev. to 2017) § 21a-278 (b). On appeal, the defendant claims that the trial court (1) improperly denied his motions for a mistrial following testimony on the ultimate issue of his intent and following testimony concerning alleged prior misconduct, and (2) erred in denying his motion to suppress evidence seized during the execution of a search warrant that had been issued without probable cause. We affirm the judgment of the trial court.

The following facts, which reasonably could have been found by the jury, and procedural history inform our review of the defendant's appellate claims. On October 10, 2017, following a narcotics investigation in which Middletown police officers twice observed the defendant sell crack cocaine to a confidential informant, the police officers applied for, and were granted, a search warrant for the defendant's Middletown apartment (apartment). Members of the narcotics unit of the Middletown Police Department executed the warrant on October 13, 2017. The police arrived outside the apartment between 6 and 6:30 p.m., where they conducted surveillance before knocking, at approximately 7:40 p.m., on the apartment door. After receiving no response to their knock, the police breached the door. The police observed a sparsely furnished and tidy apartment, and it appeared that no one other than the defendant lived there. The police detained the defendant, who had been in bed, without incident.

During their search of the apartment, the police found a large container on the kitchen table, which contained 121 bags of individually packaged crack cocaine and 14 glassine bags of heroin. The estimated street value of the crack cocaine and heroin totaled approximately $3110 and $140, respectively. The police also found many "tear bags"[1] behind an electrical outlet cover in the defendant's bedroom, and they found a razor blade with a white substance on it that later was determined to be cocaine. In addition to seizing those items, the police also seized $1524 in cash, a laptop computer, a flat screen TV, jewelry, and mail addressed to the defendant.

The defendant, thereafter, was charged with two counts of possession of narcotics with intent to sell. Following a jury trial that resulted in guilty findings, the court rendered a judgment of conviction of both counts and imposed a total effective sentence of twelve years of incarceration, execution suspended after seven years, with three years of probation. This appeal followed. Additional facts and procedural history will be

set forth as necessary.

### I

On appeal, the defendant first claims that the trial court improperly denied his motions for a mistrial following testimony on the ultimate issue of his intent to sell narcotics and following testimony concerning alleged prior misconduct. After setting forth our standard of review of the trial court's decision to deny a motion for a mistrial, we will address each claim in turn.

"In our review of the denial of a motion for [a] mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Berrios*, 320 Conn. 265, 274, 129 A.3d 696 (2016). Furthermore, "[w]hile the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances [that] may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 702, 911 A.2d 1055 (2006).

### A

We first consider whether the court improperly denied the defendant's motion for a mistrial following the testimony of Detective Nathaniel Peck. The defendant alleges that Peck opined on the ultimate issue of whether the defendant *intended to sell* narcotics. The defendant argues that, during trial, he did not contest the fact that he possessed narcotics; the only issue in dispute was whether he intended to sell those narcotics. The defendant contends that Peck opined on the defendant's intent in this case when Peck testified that possession of 121 individually wrapped bags of crack cocaine would be consistent with someone who is selling narcotics, rather than someone who is using narcotics. The state argues that the defendant did not object to the state's question about the 121 individually wrapped bags of crack cocaine, that the question and the answer both were in compliance with our Code of Evidence, and that Peck answered a hypothetical question posed

by the state about *any person*, not a question about *this defendant*. We conclude that the court did not abuse its discretion when it denied the defendant's motion for a mistrial on the basis of Peck's testimony.

The following additional facts and procedural history are necessary to our resolution of the defendant's claim. Prior to the start of evidence, the state declared its intention to call an expert in the area of trafficking of narcotics. Specifically, on February 4, 2019, the state filed a motion in limine to permit expert testimony on the issue of whether the evidence it intended to present during its case-in-chief regarding the items seized at the apartment was consistent with mere drug usage or whether it was consistent with drug sales. In its motion, the state represented that "[t]he expert would not comment on this particular defendant's intent and indeed would not even be aware of the allegations surrounding this particular incident. Rather, such expert would testify relative as to the customs and trade practices of drug traffickers generally, which has been held by our Supreme Court to be proper . . . . Indeed, the expert who the state would present is not and has never been a member of the arresting agency in this case . . . ." (Citations omitted.) On February 25, 2019, the court granted the state's motion.

Before the start of evidence, however, the state notified the court of its intention to have Detective Peck testify as both a fact witness and its expert witness on the trafficking of narcotics. Although the defendant did not object to Peck testifying both as a fact and as an expert witness, he did object to Peck testifying to the ultimate issue of whether the defendant possessed the narcotics with the intent to sell. The trial court agreed.

As a fact witness, Peck testified about the execution of the search warrant on October 13, 2017, and what the police found at the apartment. Thereafter, the state laid a foundation to qualify Peck as an expert in the area of crack cocaine and heroin trafficking. When asked by the trial court, the defendant did not object to Peck's qualifications. As an expert witness, Peck testified about the items that crack cocaine and heroin dealers usually have in their homes, noting that dealers often have digital scales, customer lists, crack cocaine broken down into individual baggies, heroin broken down into individual glassine bags, spoons, razor blades, and money. Peck then explained that in homes of users of cocaine and heroin, police would find glass tubes with burnt ends, copper wool, torn bags, crack pipes, burnt spoons, needles, cotton, Q-tips, and straws. Peck also explained how crack cocaine and heroin are ingested.

The state then asked Peck to opine about the quantities of drugs in the possession of drug dealers versus those in the possession of drug users. Specifically, the following colloquy took place between the prosecutor and Peck:

"[The Prosecutor]: And now I'm going to ask you a series of hypothetical questions that pertain to crack cocaine. So, based on your training and experience, if you found an individual in possession of 121 individually wrapped [baggies] consisting of crack cocaine, would that be consistent, based on your training, with someone who was selling or using?

"[Peck]: That's consistent, in my opinion, with someone [who] is selling crack cocaine.

"[The Prosecutor]: And how would you make that determination?

"[Peck]: By the sheer volume of the crack cocaine as—as one, in addition to the fact that it's individually wrapped. That is typically done for prepackaged for street level sales.

"[The Prosecutor]: And how would you determine whether items seized are for personal use versus for sale?

"[Peck]: You can determine that based on what else you find in the area, though the entire scene would have to be—to understand it, but you'd have to find devices used to smoke crack cocaine. If the person smoking it—that's really the only way to take it—you would find those items in the residence.

"[The Prosecutor]: Based on your training and experience, if someone is using crack cocaine, would they usually have large amounts of crack cocaine in reserve?

"[Peck]: No.

"[The Prosecutor]: And—and why is that, Detective?

"[Peck]: Typically, the addiction to crack cocaine is pretty overwhelming . . . . I haven't been in any residences . . . where individuals were inside using crack cocaine that weren't unkempt. You're going to find torn bags. You—you would see these things all—all throughout the residence. The sheer quantity of crack cocaine itself is astronomical to price to—to acquire that much. Individuals typically go out and buy what they need at the time.

"[The Prosecutor]: And so, this leads me to my question. If someone is a—a crack cocaine user, would they usually have large amounts of cash?

"[Peck]: Also, no. They would be spending what they had at the time to get high and then sorting out the next time they needed to get high by selling, trading, stealing, whatever—whatever they had to do to get more crack cocaine.

"[The Prosecutor]: I think you've already testified to this, but what . . . [is] the street value of crack cocaine [in] Middlesex County?

"[Peck]: It's sold at—the street value is $10 per 0.1

gram[s] of crack cocaine.

"[The Prosecutor]: So, if someone had 31.1 grams of crack cocaine, what would be the value of that crack?

"[Peck]: $3110.

"[The Prosecutor]: Now, I'm going to switch gears and ask you some hypothetical questions about heroin. Based on your training and experience, if you found an individual in possession of fourteen glassines of heroin, would that be consistent with someone selling and—

"[Peck]: That could be either way.

"[The Prosecutor]: Would you please explain that?

"[Peck]: If an individual [is] involved in the use of heroin, fourteen bags is not an exceptional amount for a person to be using heroin. However, you would have items that you would see associated with that. It would be, again, if they're [intravenous] users, they would have needles, they would have cotton, [and] they would have spoons. If they're snorting it, typically they're using a device to ingest into [their] body. Again, rolled—rolled bills, rolled pieces of paper, straws. One without the other would say that it makes it clear that you're either involved in the sale or involved in the use.

"[The Prosecutor]: And based on your training and experience, if someone is a heroin user would they usually have a large reserve of heroin on them or with them?

"[Peck]: Not usually, no.

"[The Prosecutor]: And why is that?

"[Peck]: Again, similar to the—the crack cocaine [addiction], heroin is significantly overwhelming. The addiction to it is substantial. Individuals that are involved in using it are going to buy what they need for the time they need to get high, and, at the next time they need to get high, they're going to sort that out.

"[The Prosecutor]: And . . . Detective . . . what is the street value of heroin in Middlesex?

"[Peck]: Middlesex is approximately $10 per bag of heroin.

"[The Prosecutor]: So, if someone has fourteen bags of heroin, what would be the street value?

"[Peck]: Approximately $140."

The defendant did not object to this testimony, or ask that it be stricken from the record, or request that the court give a cautionary instruction to the jury. Immediately after the state concluded its examination of Peck, however, defense counsel asked that the court excuse the jury, which it did, and he then requested that the court declare a mistrial. The following colloquy occurred:

"[Defense Attorney]: Your Honor, at this time, I would

move for [a] mistrial. Something of the fact that [the] state did bring up the issues. I understand it was in a hypothetical format, but [it] used the 121 bags and the 14 bags, more so on the crack cocaine, that was very—I think it was going almost to the ultimate issue based on this officer's testimony that it was his opinion and it was for sale. If—if the state had used a more—a safer approach in talking as [it] did with the—with the witness about what commonly is observed in the homes of users versus the home of—of dealers, certainly that was sufficient in order to establish that what was down in the apartment was more consistent with drug dealing than—than not drug dealing. But once the state went further and then asked specifically about the 121 bags and the 14 bags—the 14 glassine bags and the 121 bags of crack cocaine, it went beyond that and it went to the ultimate issue.

"The Court: All right. Well, you wish be heard on that?

"[The Prosecutor]: I don't think it went to the ultimate issue—issue, Your Honor. I said consistent with. I did not say whether or not it was his opinion whether or not the defendant was possessing it with intent to sell.

"The Court: Well, certainly, experts can give an opinion based on their training and expertise, and, also, they can give an opinion on hypotheticals. Hypotheticals have to, however, be based on—on some evidence that would be introduced. [The prosecutor] did use 121 bags of cocaine and 14 bags of heroin, but this witness gave an opinion based on his expertise. [The state] certainly has to follow up on the issue of the number of bags of heroin and—and crack cocaine. I don't think this witness' opinion has gone beyond that of just a—just a general opinion based on his expertise and training.

"[Defense Attorney]: Thank you, Your Honor.

"The Court: So, I'll—I'll deny the motion—the motion [for] a mistrial."

On appeal, the defendant argues: "The state, through its expert, made clear to the jury that the state's questions were referring to [the defendant] and the drugs in his apartment, not some hypothetical defendant. Peck's testimony left the jury with no other possible conclusion than [the defendant] had the intent to sell. [The defendant] was not convicted by a jury of his peers, but by his arresting officer. This constituted reversible error; the defendant's motion for mistrial was improperly denied." We disagree.

Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue." Section 7-3 (a) of the Connecticut Code of Evidence provides:

"Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue."

Pursuant to General Statutes § 54-86i, "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto, except that such expert witness may state his diagnosis of the mental state or condition of the defendant. The ultimate issue as to whether the defendant was criminally responsible for the crime charged is a matter for the trier of fact alone."

Finally, § 7-4 of the Connecticut Code of Evidence provides: "(a) Opinion testimony by experts. An expert may testify in the form of an opinion and give reasons therefor, provided sufficient facts are shown as the foundation for the expert's opinion.

"(b) Bases of opinion testimony by experts. The facts in the particular case upon which an expert bases an opinion may be those perceived by or made known to the expert at or before the proceeding. The facts need not be admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject. The facts relied on pursuant to this subsection are not substantive evidence, unless otherwise admissible as such evidence.

"(c) Hypothetical questions. An expert may give an opinion in response to a hypothetical question provided that the hypothetical question: (1) presents the facts in such a manner that they bear a true and fair relationship to each other and to the evidence in the case; (2) is not worded so as to mislead or confuse the jury; and (3) is not so lacking in the essential facts as to be without value in the decision of the case. A hypothetical question need not contain all of the facts in evidence."

In the present case, Peck was presented both as a fact witness and as an expert, without objection. Peck was asked hypothetical questions by the state, to which the defendant did not object. Those questions did not refer to this particular defendant, but, rather, they referred generally to someone who sells narcotics, and Peck was asked to opine, as a qualified expert, on whether a particular amount of narcotics was consistent with sales as opposed to usage. As our Supreme Court explained in *State* v. *Nash*, 278 Conn. 620, 651, 899 A.2d 1 (2006), "the significance of the quantity of narcotics found on a suspect is not within the common knowledge of the average juror and, therefore, is a proper subject of expert testimony." (Internal quotation marks omitted.)

We conclude that *Nash* is directly on point.

In *Nash*, an expert witness had testified about "the practices of street level narcotics dealers, including whether possessing certain quantities of narcotics is consistent with the sale, rather than personal use, of the narcotics and how street level dealers sell narcotics and what type of packaging they generally use." Id., 649. Similar to the present case, the defendant in *Nash* then contended that the expert's testimony "was more prejudicial than probative because [he] essentially had offered an opinion on the sole disputed issue at trial— whether the defendant possessed the cocaine with the intent to sell." Id., 650–51. Our Supreme Court disagreed, stating that the defendant was unable to cite any Connecticut case that stood "for the proposition that the testimony improperly was admitted because it is within the average jurors' ability and common knowledge to determine whether a person possessing thirty-eight small bags of cocaine intends to sell the narcotics or buys it in bulk to keep it for personal consumption." Id., 652. Our Supreme Court concluded: "To the extent that [the expert] opined that, under a hypothetical set of facts similar to those at issue here, the conduct was more consistent with the sale of narcotics than the purchase of narcotics, we do not construe this testimony as an opinion as to the ultimate issue of fact." Id., 653.

Under the clear guidance of *Nash*, we conclude that Peck's response to the state's hypothetical questions did not amount to an opinion as to the ultimate issue in the case, namely, the intent to sell narcotics. As was the case in *Nash*, the testimony in the present case concerned a hypothetical individual, not this particular defendant. Accordingly, the court did not abuse its discretion in denying the defendant's motion for a mistrial after Peck's testimony.

B

We next consider the defendant's claim that the court improperly denied his motion for a mistrial following the testimony of Sergeant George Yepes, which the defendant alleges contained a reference to prior misconduct by the defendant. He argues that the court specifically had prohibited the introduction of prior misconduct evidence in its ruling in limine. The state argues that the court properly ruled on the motion for a mistrial because Yepes' answer was responsive to defense counsel's question and, therefore, was invited. The state also argues that Yepes' testimony did not refer to prior misconduct. We agree with the state.

The following additional facts inform our review of this claim. The state had filed a motion to permit the introduction of prior misconduct evidence, which the defendant opposed. On the first day of evidence, the court ruled that such evidence was not admissible. Later that day, during cross-examination, the following collo-

quy occurred between defense counsel and Yepes:

"Q. Now, you're—you're familiar with—with the evidence that was seized from [the defendant's] apartment?

"A. Yes, sir.

"Q. And that included five tear bags from an outlet?

"A. From an outlet, sir, yes.

"Q. Before going into the apartment, did you have any knowledge how long [the defendant had] lived in that apartment?

"A. He was there for a while. I'm not sure exactly how long though.

"Q. You know that? That was part of your investigation to determine how long he lived there?

"A. I believe from other situations that involved him, yes."

Defense counsel immediately asked for the jury to be excused, and he requested that the court declare a mistrial. He argued that the answer was nonresponsive and that it informed the jury that the defendant had had prior involvement with the police. The court explained that it appeared that the question asked Yepes how he knew that the defendant lived at the apartment and that Yepes' answer was responsive to that question. The state argued that Yepes merely stated that he knew the defendant lived there "from other situations," but that Yepes did not give any type of details or indicate that it was from prior misconduct by the defendant. The trial court denied the motion, and defense counsel stated that he did not want the court to give a limiting or curative instruction. The court, however, instructed Yepes not to discuss prior arrests or convictions. It then recalled the jury. The defendant claims that the court abused its discretion in denying his motion for a mistrial. We are not persuaded.

"[A]s a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged." (Internal quotation marks omitted.) *State* v. *Nash*, supra, 278 Conn. 658.

We, again, are guided by our Supreme Court's decision in *Nash*. See id., 656–60. In *Nash*, the trial court had granted a motion in limine to exclude prior misconduct evidence related to the defendant. Id., 655–56. During the state's direct examination of a police officer, the officer testified that he knew the defendant "from previous related police intervention in the area in the past." (Internal quotation marks omitted.) Id., 656. The defendant thereafter moved for a mistrial, arguing that this testimony was akin to the officer telling the jury that he

knew the defendant from the defendant's prior criminal misconduct. Id., 656–57. Our Supreme Court concluded that the trial court had not abused its discretion in denying the motion for a mistrial because the officer's statement was "vague as to whether the defendant had engaged in any misconduct to prompt the police intervention . . . [and the] statement conceivably could have been a reference to a situation in which the defendant had been a victim, a witness or an innocent bystander." Id., 658. The court also stated that the officer's statement did "not reference explicitly a notorious criminal past." Id., 658–59. The court then noted that, even if the jury, arguably, could have interpreted the officer's statement to be a comment about the defendant's prior criminal conduct, the trial court had provided a curative instruction that would have cured any possible prejudice. Id., 659–60.

In the present case, Yepes' statement merely mentioned "other situations," which, as in *Nash*, could have referred to anything. Yepes did not mention prior misconduct, police investigations, or anything nefarious. As was the case in *Nash*, Yepes' statement that he was familiar with the defendant from "other situations" that involved him "conceivably could have been a reference to a situation in which the defendant had been a victim, a witness or an innocent bystander." *State* v. *Nash*, supra, 278 Conn. 658. Although the trial court in this case did not give a curative instruction, defense counsel specifically told the court that he did not want such an instruction. "Defense counsel cannot opt for a mistrial instead of a curative instruction, as if the two were interchangeable. If defense counsel decides to move for [a] mistrial and altogether eschews the instruction, the trial court cannot be compelled by that decision to go further than it otherwise would." (Internal quotation marks omitted.) *State* v. *Coltherst*, 87 Conn. App. 93, 102, 864 A.2d 869, cert. denied, 273 Conn. 919, 871 A.2d 371 (2005). We conclude that the defendant has failed to establish that the court abused its discretion in denying his motion for a mistrial on the basis of Yepes' testimony.

II

The defendant also claims that the trial court abused its discretion in denying his motion to suppress evidence seized during the execution of the search warrant because the warrant had been issued without probable cause. The defendant argues that "the affidavit for [the search] warrant failed to state with particularity the probable cause to believe drugs or evidence of sales could be found at [the defendant's apartment]. The affidavit failed to establish a nexus between the items sought and the subject of the search. Finally, the affidavit was utterly devoid of factual bases for knowledge and credibility concerning the use of the [apartment], and therefore failed the 'totality of the circumstances test' of *Illinois* v. *Gates*, [462 U.S. 213, 238, 103 S. Ct.

2317, 76 L. Ed. 2d 527 (1983)]." In response, the state argues that the trial court properly denied the defendant's motion to suppress after determining that the warrant application was supported by probable cause. We agree with the state.

The following additional facts inform our review of the defendant's claim. The defendant filed a motion to suppress the evidence that the police had seized during the execution of the search warrant for his apartment. In his motion, he claimed, inter alia, that "the police lacked probable cause to enter the [apartment]."[2] In its memorandum in opposition to the defendant's motion to suppress, the state argued that the warrant application was supported by probable cause, that a judge properly had signed the warrant after determining that probable cause existed, and that any evidence seized from the apartment was admissible at trial. The state further argued that the defendant had failed to explain how or why the warrant lacked probable cause.

During the hearing on the motion to suppress, the defendant presented the testimony of Detectives Justin Lathrop and Peck, both of whom were affiants on the search warrant application. The defendant thereafter argued to the trial court that Lathrop and Peck had failed to "establish the credibility, the veracity, [and] the reliability of the confidential informant." He argued that the affidavit failed to provide information "about the confidential informant, his criminal history, whether . . . he has a pending case to establish whether . . . he has a motive to be dishonest or untruthful" and that it also failed to state whether the confidential informant knew the defendant. Finally, the defendant argued that, although "the officers did establish [during their testimony] that they had familiarity with [the defendant] and that . . . the confidential informant had previous dealings with [the defendant] prior to the controlled buys, the four corners of the warrant [do] not set forth that information, and, therefore, a neutral and detached [judge] would not have been able to verify that information just through the language of the affidavit, and, therefore, the affidavit was insufficient to establish probable cause." The state argued that the affidavit provided more than sufficient facts to establish probable cause. After setting forth the relevant allegations from the search warrant application, including the affidavit of Peck and Lathrop, the court issued an oral ruling in which it concluded that there had been "probable cause for the warrant." The court then denied the defendant's motion to suppress.

"The legal principles guiding our probable cause analysis are well established. Both the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution prohibit the issuance of a search warrant in the absence of probable cause. . . . Probable cause to search is established if there is

probable cause to believe that (1) . . . the particular items sought to be seized are connected with criminal activity or will assist in a particular . . . conviction . . . and (2) . . . the items sought to be seized will be found in the place to be searched. . . . There is no uniform formula to determine probable cause—it is not readily, or even usefully, reduced to a neat set of legal rules—rather, it turns on the assessment of probabilities in particular factual contexts . . . . Probable cause requires less than proof by a preponderance of the evidence . . . . There need be only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause . . . . [T]he relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts. . . . The task of the issuing [judge] is simply to make a practical, [commonsense] decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . .

"In our review of whether there was probable cause to support the warrant, we may consider only the information that was actually before the issuing judge . . . and the reasonable inferences to be drawn therefrom. . . . The judge is entitled to rely on his own common sense and the dictates of common experience, although the standard for determining probable cause is an objective one. . . . [B]ecause of our constitutional preference for a judicial determination of probable cause, and mindful of the fact that [r]easonable minds may disagree as to whether a particular [set of facts] establishes probable cause . . . we evaluate the information contained in the affidavit in the light most favorable to upholding the issuing judge's probable cause finding. . . . We review the issuance of a warrant with deference to the reasonable inferences that the issuing judge could have and did draw . . . and . . . uphold the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the [judge's] conclusion that probable cause existed. . . . The fact that we might draw different reasonable inferences from the affidavit than the issuing judge does not alter our conclusion. On the contrary, we defer to the issuing judge's reasonable inferences, even when other inferences also might be reasonable, or when the issuing judge's probable cause finding is predicated on permissible, rather than necessary, inferences. . . . In a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the [issuing judge's] determination." (Citations omitted; internal quotation marks omitted.) *State* v. *Sawyer*, 335 Conn. 29, 37–39, 225 A.3d 668 (2020).

We now must determine whether, on the basis of the totality of the circumstances described in the affidavit in support of the arrest warrant, and the reasonable inferences drawn therefrom, the trial court properly ruled that the issuing judge reasonably could have concluded that there was a substantial chance that the defendant had drugs in his apartment. We conclude that the affidavit reasonably supports this conclusion and that, therefore, the trial court properly denied the defendant's motion to suppress.

Peck and Lathrop, being duly sworn, attested that they had probable cause to believe that the defendant had crack cocaine, cocaine, and related paraphernalia in his apartment. They provided an affidavit that contained the following relevant facts, which they stated they knew from their own personal observations and knowledge, as well as from other officers and official police reports and statements: "Since January of 2017, the [n]arcotics [u]nit has received multiple reports from [reliable confidential informants, informants, arrested persons, concerned citizens, anonymous callers and police officers] that [the defendant] . . . has been selling crack cocaine from both his [apartment] and throughout Middletown, CT. . . . A check of the [Department of Motor Vehicles] records, Middletown [P]olice [Department] records, and [the National Crime Information Center] shows [the defendant] as a resident of [the apartment]. . . . During the month of August, 2017, Detective Peck met with a confidential informant. . . . This informant has provided information concerning narcotic dealing in the past, which had been corroborated and found to be true and accurate. . . . Peck supplied the [confidential informant] with an amount of [n]arcotic [u]nit funds. The [confidential informant] was searched prior to being supplied with said funds . . . . Peck was present when the [confidential informant] contacted [the defendant] via his phone and arranged this purchase. [The defendant] advised the [confidential informant] to meet him at a specific prearranged meet location. Detective Peck followed the [confidential informant] directly to this location, and the [confidential informant] never stopped or met with anybody [else]. . . . Detective Lathrop . . . observed [the defendant exit] the common door of his residence/apartment building. Detective Dirga observed [the defendant arrive] at the meet location and [meet] with the [confidential informant]. An exchange between the two took place . . . . Detectives Dirga and Lemieux followed the [confidential informant] from the area and observed as the [confidential informant] returned directly to the prearranged location to meet Detective Peck without stopping or meeting anyone [else]. [The defendant] also exited the area, and [he] returned to [his apartment]. . . . At the prearranged meet location the [confidential informant] turned over an amount of an off-white colored [rock like] substance suspected to

be crack cocaine. . . . Detective Peck transported the suspected crack cocaine to [headquarters] and tested the suspected crack cocaine . . . which resulted in a positive reaction . . . .

"Within [forty-eight] hours of October 2, 2017, Detective Peck [again] supplied the [confidential informant] with an amount of [n]arcotic [u]nit funds. The [confidential informant] was searched prior to being supplied with said funds and was found to be free of any [moneys] or contraband. The [confidential informant] was instructed to contact [the defendant] and arrange the purchase of crack cocaine. . . . Detective Peck was present when the [confidential informant] contacted [the defendant] via his phone and arranged this purchase. [The defendant] advised the [confidential informant] to meet him at a specific prearranged [meeting] location. Detective Peck followed the [confidential informant] directly to this location and the [confidential informant] never stopped or met with anybody. Detective Lathrop . . . observed with a clear and unobstructed view, as [the defendant] exited the common door of his residence/apartment building. Sergeant Yepes observed [the defendant arrive] at the [meeting] . . . with the [confidential informant]. An exchange between the two took place and the [confidential informant] exited the area. Detectives Dirga and Lemieux followed the [confidential informant] from the area and observed as the [confidential informant] returned directly to the prearranged location to meet Detective Peck without stopping or meeting anyone. [The defendant] also exited the area and returned to [his apartment]. . . . [The confidential informant] turned over an amount of an off-white colored [rock like] substance . . . which resulted in a positive reaction for the presumptive presence of crack cocaine."

Peck and Lathrop also averred that they knew "that individuals involved in the illegal possession of and sale of narcotics . . . receive at their residence . . . a large quantity of substance that they would cut into smaller quantities for sale to other persons." They further averred: "[A] [s]tate [p]olice [r]ecord [c]heck . . . revealed that [the defendant] has two previous arrests from [their] agency for [p]ossession of [n]arcotics ([two] counts), [s]ale of [n]arcotics, [p]ossession with [i]ntent to [s]ell, [and that] [t]hese cases are currently pending . . . . Based on the preceding information, [Peck and Lathrop averred that they] believe that [the defendant] is currently storing narcotics with the intent for further distribution within his residence . . . ." We conclude that this affidavit, under the totality of the circumstances, supported a finding of probable cause.

The defendant contends that the information in the affidavit provided an insufficient nexus to his apartment. Specifically, he argues: "This affidavit fails to establish the factual basis for the conclusion that [the

defendant's] home was being used as [a] base of operations, and fails to remedy that defect with corroborating evidence." We disagree.

Peck and Lathrop averred that they had received multiple reports of the defendant selling narcotics out of his apartment. The police then used a confidential informant, who previously had provided them with reliable information, to set up two controlled purchases from the defendant. Immediately before both purchases, the confidential informant telephoned the defendant, who was at his apartment. The confidential informant then went to the prearranged meeting location. The defendant left his apartment also to go to the prearranged meeting location, where the controlled buy took place, under police observation. The defendant thereafter returned to his apartment. Although the defendant argues that there was no nexus between the controlled buys and his apartment, a reasonable inference readily can be made that the defendant left his apartment with the drugs when he went to the prearranged meeting location. On the basis of the totality of the circumstances, including the reasonable inferences drawn from the facts set forth in the affidavit, we conclude that there was probable cause to support the issuance of the search warrant for the defendant's apartment, and that the trial court, therefore, properly denied the defendant's motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Sergeant Frederick Dirga testified that tear bags are plastic sandwich bags used to package drugs for sale. He explained that individuals "involved in the narcotics trade will take drugs . . . put [them] into the bag, and . . . tear off the end of the bag . . . so they're able to tie [the bag] around the drugs, so [the drugs are] protected in plastic and easier to carry for sale. It doesn't break apart."

[2] In his motion to suppress, the defendant also claimed that the police had "made affirmative false and misleading representations in the search warrant to secure a probable cause finding against the defendant." The trial court rejected that claim, and the defendant on appeal has not claimed error in this regard.